# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| DEAN ZINETTI AND ANGELA K. ZINETTI, | : |
| | : |
| Plaintiffs, | : |
| | : C.A. No. 1:19-cv-01279-WCB |
| v. | : |
| | : |
| DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR SAXON ASSET SECURITIES TRUST 2007-3, MORTGAGE LOAN ASSET BACKED CERTIFICATES, SERIES 2007-3; and, OCWEN LOAN SERVICING, LLC, | : |
| | : |
| Defendants. | : |

## OPENING BRIEF
## IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Joelle E. Polesky (ID No. 3694)
Stradley Ronon Stevens & Young, LLP
1000 N. West Street Suite 1279
Wilmington, DE 19801
Telephone: (302) 295-4856
Facsimile: (302) 295-4801
Email: jpolesky@stradley.com

OF COUNSEL:
Walter J. Buzzetta (admitted *pro hac vice*)
Stradley Ronon Stevens & Young, LLP
2000 K Street, Suite 700
Washington, D.C. 20006
Email: wbuzzetta@stradley.com

*Attorneys for Defendants,*
*Deutsche Bank National Trust Company, as*
*Trustee for Saxon Asset Securities Trust*
*2007-3, Mortgage Loan Asset Backed*
*Certificates, Series 2007-3 and*
*Ocwen Loan Servicing, LLC*

Dated: April 18, 2022

## TABLE OF CONTENTS

I.      INTRODUCTION ...............................................................................................1

II.     NATURE AND STATE OF THE PROCEEDINGS....................................................2

III.    SUMMARY OF MATERIAL FACTS...........................................................................3

IV.     ARGUMENT .....................................................................................................10

        A.      All Claims Must Fail as the Zinettis Cannot Show Improperly Billed Escrow10

        B.      The FDCPA Claims (Counts III, IV and V) Fail because Ocwen is Neither a
                Debt Collector Nor Engaged in Improper Debt Collection Activity. ..............13

                1.      Ocwen is Not a Debt Collector ...........................................................13

                2.      The Zinetti do not Allege Activity Violative of the FDCPA. ............15

                3.      Count IV is also Time Barred. ............................................................16

        C.      The Zinettis Cannot Show Failure to Conduct a Reasonable Onvestigation or
                the Required Pattern and Practice Necessary to Support a Claim under RESPA.
                .................................................................................................................17

        D.      The Zinettis' Breach of Contract Claim is Time-Barred. ...............................19

V.      CONCLUSION..................................................................................................20

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alamo v. ABC Financial Services, Inc.*,
   2011 WL 221766 (E.D. Pa. Jan. 20, 2011) ................................................................14

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................................10

*Barbato v. Greystone Alliance, LLC*,
   916 F.3d 260 (3d Cir. 2019) ....................................................................................14

*Bennett v. Nationstar Mortg., LLC*,
   2015 WL 5294321 (S.D. Ala. Sept. 8, 2015) ............................................................19

*Bulmer v. Midfirst Bank, FSA*,
   59 F. Supp. 3d 271 (D. Mass. 2014) ........................................................................19

*In re Chew*,
   627 B.R. 112 (E.D. Pa. 2021) .............................................................................3, 4, 5

*City of Cambridge Retirement System v. Altisource Asset Management Corp.*,
   908 F.3d 872 (3d Cir. 2018) ....................................................................................13

*Croskrey v. Ocwen Loan Servicing LLC*,
   2016 WL 3135643 (C.D. Cal. June 2, 2016) ........................................................ i, 19

*Davenport v. Capio Partners LLC*,
   2021 WL 1666977 (M.D. Pa. Apr. 28, 2021) ............................................................16

*Davis v. Deutsche Bank National Trust Co.*,
   2017 WL 6336473 (E.D. Pa. Dec. 12, 2017) ............................................................19

*Gatling v. CitiMortgage, Inc.*,
   2012 WL 3756581 (S.D. Tex. 2012) ........................................................................15

*Grundy v. HSBC Bank, USA, N.A., as Trustee for Registered Noteholders of
Renaissance Home Equity Loan Trust
2006-3*, 2020 WL 1326269 (D. Mass. Feb. 10, 2020) ..............................................12

*Gunn v. Specialized Loan Servicing LLC*,
   2017 WL 976621 (D. Del. Mar. 13, 2017) ..............................................................14

*Ingram v. Experian Information Solutions, Inc.*,
   2021 WL 2681265 (E.D. Pa. June 30, 2021) ............................................................16

*Lewis v. PNC Bank, N.A.*,
    2018 WL 6249989 (S.D. Ohio Nov. 29, 2018)...................................................................19

*Martin v. Select Portfolio Servicing Holding Corp.*,
    2008 WL 618788 (S.D. Ohio Mar. 3, 2008) .......................................................................15

*McCray v. Bank of Am., Corp.*,
    2015 WL 3487750 (D. Md. June 1, 2015)...........................................................................18

*McLean v. GMAC Mortg. Corp.*,
    595 F. Supp. 2d 1360 (S.D. Fla. 2009) ...............................................................................18

*Millet v. Truelink, Inc.*,
    2006 WL 2583100 (D. Del. Sept. 7, 2006) .........................................................................19

*Miranda v. Ocwen Loan Servicing, LLC*,
    148 F. Supp. 3d 1349 (S.D. Fla. 2015) ...............................................................................19

*Prince v. NCO Financial Services, Inc.*,
    346 F. Supp. 2d 744 (E.D. Pa. 2004) ..................................................................................14

*Rakestraw v. Nationstar Mortg., LLC*,
    2021 WL 3716656 (N.D. Ga. Mar. 19, 2021).....................................................................19

*Ramos v. Wells Fargo Bank, N.A.*,
    2019 WL 2743454 (D.N.J. Apr. 24, 2019) .........................................................................14

*Russell v. Nationstar Mortg, LLC*,
    2015 WL 5819663 (S.D. Fla. Oct. 6, 2015)........................................................................18

*Scott v. Wells Fargo Home Mortgage, Inc.*,
    326 F. Supp. 2d 709 (E.D. Va.), *aff'd. mem.*, 67 Fed. Appx. 238 (4th Cir.
    2003) ....................................................................................................................................14

*Vassalotti v. Wells Fargo Bank, N.A.*,
    732 F. Supp. 2d 503 (E.D. Pa. 2010) ..................................................................................17

*Wenzel v. National Creditors Connection, Inc*,
    2018 WL 1902699 (D.N.H. Apr. 20, 2018).........................................................................19

*Whittaker v. Wells Fargo Bank, N.A.*,
    2014 WL 5426497 (M.D. Fla. Oct. 23, 2014) .....................................................................17

*Wilson v. Bank of America, N.A.*,
    48 F. Supp.3d 787 (E.D. Pa. 2014) .....................................................................................17

**Statutes**

12 U.S.C. § 2609(a) ............................................................................................................4

15 U.S.C. § 1692e(8) ........................................................................................................16

15 U.S.C. §1692g(a) .........................................................................................................16

15 U.S.C. § 1692g(b) ............................................................................................15, 16, 17

15 U.S.C. § 1692k ............................................................................................................17

Fair Credit Reporting Act .........................................................................................8, 9, 16

Fair Debt Collection Practices Act, 15 U.S.C. § 1692........................................... *passim*

Real Estate Settlement Procedures Act, 12 U.S.C. § 2601-2617........................... *passim*

**Other Authorities**

12 C.F.R. § 1024.17(b) ................................................................................................4, 6, 7

12 C.F.R. § 1024.17(c)(1)(i) ..............................................................................................4

12 C.F.R. § 1024.35(g) ....................................................................................................18

12 C.F.R. § 2024.35(e)(1)(i) ............................................................................................17

12 C.F.R. § 2605 ..............................................................................................................18

Federal Rule of Civil Procedure 56 ..............................................................................1, 10

## I.      <u>INTRODUCTION</u>

The Court should grant summary judgment on the remaining claims as there is no issue of material fact that Ocwen appropriately administered the escrow account for the Zinettis' mortgage. The Zinettis mistakenly claim that Ocwen, as mortgage servicer, wrongfully billed their monthly escrow. However, discovery confirmed the propriety of all escrow billings. The Zinettis' mistaken belief arises from their misunderstanding of the manner in which escrow is calculated. Mortgage servicers are permitted to bill and collect funds to cover anticipated payments for disbursements over the coming year, as well as an additional amount, or "cushion." Escrow calculations are not arbitrary, but instead are defined by federal regulations. From inception, the Zinettis' escrow account fell *below* the required cushion. Notwithstanding repeated efforts to explain the escrow shortage, and offering numerous opportunities for them to address the shortage, the Zinettis steadfastly elected to short pay only those amounts *they* unilaterally decided. The Zinettis compounded this shortfall by refusing to repay two months of mortgage payments mistakenly returned to them. Those two months of missing payments – along with forty-four months of underpayments – resulted in the Zinettis' default in July 2015. They have made *no payments on their mortgage since July 2015*, while still residing in the property.

The record confirms Ocwen made no errors in escrow billing on the Zinettis' account. Indeed, one of Ocwen's senior loan analysts prepared a manual reconciliation of every single entry in the payment history and conclusively demonstrated the absence of *any* improper or over-billing. This reconciliation confirms the actual calculations are not in dispute. Ocwen's escrow calculations for the Zinettis' account were also already reviewed to the satisfaction of the Delaware Department of Justice. The Zinettis and their expert try to invent their own escrow apart from the federal requirements and loan documents to conjure an issue of material fact where none exists.

The remaining claims are for breach of contract, alleged statutory violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 ("FDCPA") and the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601-2617 ("RESPA"). None can survive summary judgment. The record is clear that Deutsche Bank, the investor on the Zinettis' loan, did not breach the mortgage by permitting Ocwen to bill amounts properly due. The claim is also time-barred. Ocwen is not a debt collector pursuant to the FDCPA. Ocwen did not violate either the FDCPA or RESPA by billing for proper escrow amounts. The Zinettis cannot establish a RESPA violation because they can neither show that Ocwen's investigations into their grievances were unreasonable, nor that Ocwen engaged in a pattern and practice of non-compliance.

The Zinettis were properly billed for amounts due, they chose not to pay those amounts, and their loan fell into default as a result. The undisputed facts confirm there was no breach of the mortgage and no statutory violations. Thus, Defendants are entitled to judgment as a matter of law.

## II.    <u>NATURE AND STATE OF THE PROCEEDINGS</u>

Defendants removed to this Court on federal question grounds (D.I. 1) and filed a motion to dismiss for failure to state a claim as to all counts (D.I. 6). The Court dismissed nine claims against Deutsche Bank and six claims against Ocwen (D.I. 25). The remaining claims are breach of contract as to Deutsche Bank (Count VI); a single count under RESPA (Count II); and three counts under the FDCPA (Counts III, IV, V) against Ocwen.  Each is subject to summary judgment.

III.   **<u>SUMMARY OF MATERIAL FACTS</u>**[1]

The genesis of this dispute is the Zinettis' misunderstanding and misapplication of certain concepts fundamental to mortgage escrow accounts. Servicers, like Ocwen, are permitted to collect more for escrow than the anticipated disbursements for a given year. The collectible amount includes a legally permitted cushion, and may also need to account for any deficiencies and shortages in escrow. Not only is this permitted by law, but the Zinettis agreed to this in the loan documents they signed. (*See* Statement of Undisputed Materials Facts ("SMF") at 3-4.) That is what Ocwen did here-collect a legally permissible cushion, as nearly every escrow analysis reflects either a shortage, a deficiency, or both.

<div align="center"><em><u>Mortgage Escrow Accounts Generally</u></em></div>

Mortgage escrow accounts are vehicles through which servicers collect in advance sufficient funds to cover anticipated payments for taxes and insurance over the coming year. *In re Chew*, 627 B.R. 112, 116 (E.D. Pa. 2021). In addition to the estimated expenditures for taxes and insurance, servicers are permitted to collect an additional amount – a "cushion" – to ensure the servicer has funds to cover anticipated expenses. *Id.* When an escrow account is created, a lender may charge an initial deposit to ensure the escrow account will not fall below the "cushion" in the first 12 months. The escrow arrangement benefits both the homeowner (by ensuring they have set aside funds to meet property tax and homeowner's insurance obligations) and the lender (by protecting the mortgaged property from encumbrances or loss). The administration of escrow accounts is not left to the whim of the servicer. RESPA regulates such administration and provides:

> Throughout the life of an escrow account, the servicer may charge the borrower a monthly sum equal to one-twelfth (1/12) of the total annual escrow payments which the servicer reasonably anticipates

---

[1] Defendants incorporate by reference the Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment, contemporaneously filed with this Motion.

<div align="center">3</div>

> paying from the account. In addition, the servicer may add an
> amount to maintain a cushion no greater than one-sixth (1/6) of the
> estimated total annual payments from the account.

12 C.F.R. § 1024.17(c)(1)(i); *accord* 12 U.S.C. § 2609(a). Thus, servicers may legally require

borrowers to pay in advance the next year's expected disbursements in twelve monthly

installments, *plus* a cushion to cover *two additional months*. *Id.*; *In re Chew*, 627 B.R. at 116.

Several RESPA definitions are important for understanding escrow calculations:

- "Target balance" means the month-end balance in an escrow account sufficient to cover the remaining year's disbursements, considering both the remaining payments and the allowed cushion.

- An escrow "shortage" is "an amount by which a current escrow account balance falls short of the target balance at the time of escrow analysis." A shortage occurs when a lender compares projected disbursements for the coming year with the current balance and expected future escrow payments and determines present funds plus future expected funds will be insufficient to cover disbursements.

- An escrow "deficiency" is "the amount of a negative balance in an escrow account." The deficiency represents the amount of escrow disbursements made by the lender after escrow funds are exhausted.

12 C.F.R. § 1024.17(b). An escrow shortage is a forward-looking concept, meaning the servicer

calculates that the current stream of escrow payments will be insufficient during the coming year.

By contrast, escrow deficiency is a backwards-looking concept, meaning the servicer already

disbursed amounts greater than the funds paid into escrow. Where there is a deficiency, a servicer

makes payments and seeks to recover the deficiency through future escrow adjustments.

As taxes and insurance premiums change, servicers perform periodic analyses of escrow

sufficiency to cover projected expenditures. Any such analysis can reveal a deficiency if the year-

to-date disbursements exceed amounts collected. Likewise, an analysis can reveal a shortage –

separate from a deficiency – if the escrow projects to fall below the cushion considering anticipated

disbursements. Under this regulated system, the timing of expected disbursements greatly impacts whether a deficiency and/or shortage exists.[2]

### *The Zinettis' Escrow Account*

In 2007, the Zinettis purchased their home through a loan originated with Saxon Mortgage, Inc. ("Saxon") Saxon initially serviced the loan and collected only principal and interest. The Zinettis were responsible for directly paying their real estate taxes and insurance premiums. In 2010, however, the Zinettis sought and agreed to a loan modification pursuant to the Home Affordable Modification Program ("HAMP"), a program introduced by the federal government in 2009 to help struggling homeowners. As part of their modification, the Zinettis agreed to an adjustable interest rate and – for the first time – to start paying monthly into escrow an amount sufficient to cover their prospective property taxes and homeowner's insurance, plus two months' cushion. In connection with their modification application, Saxon prepared an initial escrow analysis in September 2009. Saxon estimated real estate taxes at $893 annually, and effective January 1, 2010, set a monthly escrow payment at $99.28 ($74.46 plus $24.82 for shortage). (SMF at 5.) Saxon did not request an initial escrow deposit to protect against shortage and instead opted to bill the Zinettis a monthly shortage to build the escrow account.

The Zinettis questioned why they had a shortage when they paid up to date their real estate tax payments. However, as set forth above, escrow accounts are designed to include two months' cushion *at their lowest point*. Thus, at the inception of *every* escrow account, where there is no initial deposit, there will *always* be a shortage until such time as the monthly payments accumulate to a point sufficient to cover the coming year's expenses, plus cushion. That was the case here.

---

[2] The court in *Chew* provided a descriptive scenario for how a servicer treats the timing of disbursements in calculating whether there is an escrow deficiency and/or an escrow shortage in order to calculate required monthly escrow payments. 627 B.R. 112, 117 (E.D. Pa. 2021).

Further adding to the initial escrow shortage was that Saxon's initial estimate failed to account for homeowners insurance. When it sent the loan modification agreement to the Zinettis in January 2010, Saxon advised the Zinettis their monthly escrow payment would increase from $99.28 to $343.15, as Saxon's updated analysis reflected a $2,175 shortage after including insurance. (SMF at 6.)[3] Saxon conducted its next analysis in December 2010. (*id.* at 7.) That analysis revealed Saxon's insurance estimate had been high and resulted in a surplus in the escrow account. Saxon accordingly returned $2,020.11 to the Zinettis and set the new monthly escrow payment at $135.60, effective February 1, 2011. (*id.*)[4]

In approximately April 2011, Saxon determined it had erred in calculating the Zinettis' principal and interest payments under the loan modification. As a result, Saxon reversed the fifteen monthly payments made by the Zinettis from January 2010 to April 2011, leaving a negative escrow balance of $4,383.33, along with a suspense balance of $19,181.28. (SMF at 8.) The total of those two numbers reflected the entirety of the Zinettis' payments and escrow obligations over that period. Saxon intended to perform an account reconciliation and to re-apply the *funds* from the suspense account and, in the process, adjust for any escrow deficiencies or surpluses. (*id.*) Saxon never did this, though, because in May 2011 servicing transferred to Ocwen. (*id.*)

---

[3] It bears noting that Ms. Zinetti promptly highlighted the shortage and handwrote on the Saxon escrow statement "wrong amount." She admitted at her deposition this was because she did not believe there could be a shortage since the Zinettis had paid taxes and insurance in 2009. As noted above, however, the shortage was forward-looking. It had nothing to do with whether the Zinettis had made these payments in 2009. Rather, it was for the anticipated shortage in 2010 given the expected disbursements.

[4] Saxon's initial establishment of the escrow account is shared for background purposes only, and to provide context for the Zinettis' mistaken belief they were overcharged. However, as set forth below, the Zinettis previously filed suit against Ocwen and Saxon relating to establishment of the escrow account. That lawsuit was resolved with the Zinettis releasing Ocwen and Saxon for any claims related to the escrow account in exchange for Ocwen, as the current servicer, performing a full accounting of the escrow account and making any necessary adjustments. Ocwen satisfied the terms of that settlement by performing a full manual accounting of the escrow account and concluding that billings to the escrow account were proper.

Given the reversals by Saxon, when Ocwen took over as servicer, the Zinettis' account appeared delinquent, reflecting past due payments going back to January 2010. (SMF at 10.) Seeing that delinquency, Ocwen returned the Zinettis' payments in July and August 2011. The Zinettis never re-sent these payments. (*id.* at 10-11.)

By September 2011, Ocwen performed the reconciliation Saxon had not. Ocwen applied both the suspense funds – using the correct principal and interest – and previously paid amounts to the escrow account using the $99.28 monthly escrow figure from Saxon's first analysis. (SMF at 12.) Ocwen then conducted a new escrow analysis, resulting in a new monthly payment of $136.97, before calculating shortage or deficiency. (*id.* at 13.) The analysis revealed a deficiency and anticipated shortage of $3,517.50. (*id.*) To assist the Zinettis, Ocwen spread the deficiency and shortage over 60 months, adding $58.63 (the $3,517.50 deficiency and shortage amount divided by 60) to the new monthly escrow calculation ($136.97) for a total monthly escrow payment of $195.60. (*id.*) Ocwen shared this amount and the related calculations with the Zinettis. (*id.*)

The Zinettis failed to make the required payments. Instead, they stubbornly made monthly payments *for the next four year*s that were each between $60 and $164.75 *less* than what was due on their account. (SMF at 13.) These short payments ultimately put the Zinettis into default.

In the interim, Ocwen conducted periodic escrow analyses. In August 2012, Ocwen's escrow analysis reflected a new monthly target payment of $139.30. (SMF at 14.) As a result of the Zinettis' persistent underpayments, the escrow shortage – which was $3,106.70 as of October 2011 – had only decreased to $2,269.10 as of August 2012. (*id.*) Ocwen again made the Zinettis aware of the shortage. This time, Ocwen agreed to spread the shortage over 48 months, for a monthly shortage payment of $71.98. (*id.*) Together with the new monthly target of payment, the

monthly escrow requirement effective October 1, 2012 became $211.28. Nevertheless, the Zinettis continued to short pay their account.

In January 2012, the Zinettis sued Ocwen and Saxon, alleging that both Saxon and Ocwen had improperly billed escrow and violated the Fair Credit Reporting Act by reporting the Zinettis' delinquency. On March 6, 2013, the parties signed a settlement agreement. (SMF at 15.) As part of the settlement, Ocwen agreed to conduct a new escrow analysis, although there was no pre-determined or contractually-agreed upon outcome for that analysis as part of the settlement agreement.[5] In exchange, the Zinettis agreed to fully and finally release Ocwen from any existing liability related to the escrow account. Ocwen performed the required review, which *confirmed* the prior calculations and revealed a new monthly escrow payment of $138.65, along with an existing total shortage of $3,294.27. Ocwen *again* advised the Zinettis of the shortage and *again* agreed to spread the shortage out over 48 months, for a monthly shortage payment of $68.63. This brought the new monthly escrow requirement to $207.28. The Zinettis refused to pay this amount. (*id*.)

The Zinettis also complained to the Delaware Department of Justice ("DOJ").[6] In September 2013, Ocwen provided the DOJ a full and complete explanation of its escrow billing

---

[5] Specifically, the agreement states: "[Ocwen] shall perform an accurate reconciliation of the escrow account on the Loan…. Promptly upon completion of the accurate escrow account reconciliation, [Ocwen] shall adjust the amount shown on its records as the balance in the escrow account (and the subsequent monthly escrow payments required by the Borrowers) to be consistent with that reconciliation." See Exhibit J attached to the supporting declaration of Kevin Flannigan ("Flannigan Dec.").

[6] The Zinettis misunderstood the terms of the settlement agreement. First, they expected to be "current" as of the date of the settlement, even though that is not stated in the agreement, and nothing in the agreement suggests waiver or a "zeroing out" of the Zinettis' many underpayments. (SMF at 15-17.) Moreover, the Zinettis expected a "reconciliation" of their escrow account meant Ocwen would alter its payment history. However, the agreement does not require that. Additionally, Ocwen would never do this. (*id.* at 17.) Ocwen's payment records use a ledger system whereby each entry is made in the ledger at the time it occurs. If there is an error, the entry is not deleted and re-entered, it is adjusted through a later entry. This is clear from both the payment histories produced throughout the years in this case, as well as the complete manual reconciliation. Ocwen uses a reversal or credit entry to make adjustments. After the settlement, consistent with their agreement, Ocwen credited the Zinettis' account for $1,142.46 for prior charged fees and also

along with all prior escrow analyses. Satisfied with Ocwen's detailed accounting and explanation, the DOJ made no further inquiries. (SMF at 20.)

The Zinettis do not contend there were any errors in escrow calculations after March 2013. Yet they continued to underpay each month. From November 2011 to July 2015 – *a period of 44 months* – the Zinettis failed to pay the amount billed. (SMF at 19.) Moreover, they never re-submitted their payments from July 2011 and August 2011. As a result of their underpayments (and notwithstanding Ocwen's repeated attempts to spread out the deficiencies over several years), the Zinettis' account tumbled into default by July 23, 2015, at which point they were delinquent in the amount of $4,503.35 (or more than 3 monthly payments behind) (*id.* at 21). The Zinettis have not made *any* mortgage payments since 2015. (*id.*)

The foregoing facts are not in dispute. The Zinettis received Annual Escrow Account Disclosure Statements with detailed explanations of all money paid into and out of the escrow account. These statements included explanations of negative amounts, or insufficient "cushions," in the escrow account, which necessitated increased monthly payments over the years. Every cent is accounted for. The mortgage provides the borrower must make up any shortage in escrow funds. *See* Exhibit C to the Supporting Declaration of Kevin Flannigan.

*Unsupportable assumptions, and obvious errors by
the Zinettis' expert are not sufficient to create issues of material fact*

The Zinettis seek to manufacture an issue of fact by proffering the expert report of Bernard Jay Patterson. Patterson, who has no specialized training in the mortgage industry, prepared a "corrected" escrow accounting. His work product, however, lacks any grounding in the Zinettis' loan documents or the law pertaining to escrow accounts. It instead hinges on a series of

---

waived $119.94 in late fees. However, because the fees were not deleted as if they never existed, the Zinettis mistakenly believe they still exist and changes had not been made to their account. (*id.* at 15-17.)

unsupportable assumptions and obvious errors which render the report useless. For example, Patterson gives full credit to the Zinettis for their July 2011 and August 2011 payments which Ocwen returned and they never re-paid. He also ignores multiple escrow analyses which properly increased the Zinettis' escrow requirements. Worse yet, for years, Patterson has misrepresented his credentials in sworn testimony. The result is an unreliable and inadmissible report.[7]

Despite disputing billed escrow amounts since January 2010, the Zinettis do not and cannot offer any *admissible* evidence demonstrating actual computation errors by Ocwen. They also cannot explain their failure to remit the two returned payments from 2011, and 44 months of underpayments which led to their default. Instead, they attempt to buttress statutory claims based on a misunderstanding of escrow accounts.

## IV.   <u>ARGUMENT</u>

As "there is no genuine issue as to any material fact" regarding the Zinettis' failure to fulfill their mortgage obligations despite clear and legally permissible escrow accounting, Defendants are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact").

### A.   **All Claims Must Fail as the Zinettis Cannot Show Improperly Billed Escrow**

Each remaining claim is based on the allegation that Ocwen improperly billed the Zinettis. More specifically, the breach of contract claim against Deutsche Bank rests on the allegation that via Ocwen, it improperly billed amounts due. (Compl. ¶ 74). Likewise, the Zinettis' claims against

---

[7] Defendants are contemporaneously filing a Motion to Preclude the Expert Report and Testimony of Bernard J. Patterson.

Ocwen for supposed violations of RESPA and FDCPA hinge on allegations of wrongful billing. (*id*. ¶¶ 58, 65, 69, 72). Accordingly, in order to survive summary judgment, the Zinettis must come forward with admissible evidence which demonstrates that Ocwen improperly billed them. The Zinettis cannot lift, much less carry, this burden.

Numbers do not mislead. Ocwen's detailed accounting supports its billing. (Flannigan Dec.at ¶ 10 and Ex. A.) The Zinettis did not have an escrow deficiency because Ocwen over-billed them. Their deficiency resulted, in part, because Saxon did not require a large initial deposit at the time it established the escrow account - which benefitted the Zinettis since it provided them more time to build an escrow account. Notwithstanding this fact, the Zinettis never funded the account through their short pays. (SMF at 13, 19, 21.) Moreover, the Zinettis *admit* they never remitted the two returned 2011 payments, resulting in a $1,870.44 deficit in their account.[8] (*id.* at 11.) They also paid only $935.22 *each month* beginning in November 2011, despite the total amount due being $995.22. (*id.* at 19.) They held their monthly payment steady at $935.22 – even in the face of increases to $1,010.90 (October 2012), $1,006.90 (March 2013), to 1,138.55 (November 2014), and $1,264.76 (January 2015). (*id*.) Their monthly payment continued to rise as a result of their repeated failure to pay the amount billed---the shortage continued to mushroom, necessitating a greater catch up payment. The Zinettis never adjusted their payments to match amounts billed, even ignoring interest rate adjustments. While the Zinettis unilaterally (and arbitrarily) increased their monthly payment to $1,000 in May 2014, and $1,100 in January 2015, it was too little, too late. (*id*.) The endless short pays resulted in their delinquency and default. (*id.* at 13, 19, 21.)

---

[8] There is no dispute Ocwen erred when it returned those two payments to the Zinettis. However, that does not absolve the Zinettis from re-submitting those amounts – which all parties agree were due and owing. Nonetheless, over a decade later, the Zinettis have still not made those required payments. (SMF at 11).

*Grundy v. HSBC Bank, USA, N.A., as Trustee for Registered Noteholders of Renaissance Home Equity Loan Trust 2006-3*, 2020 WL 1326269 (D. Mass. Feb. 10, 2020) is on point. There, plaintiff alleged Ocwen over-billed escrow through its shortage calculations. After reviewing escrow statements, the Court granted summary judgment in Ocwen's favor, concluding plaintiff could not sustain claims based on improper escrow billing as insufficient evidence existed for a jury to find billing for shortage "an unreasonable estimate of future taxes and/or insurance premiums" or an inaccurate escrow balance calculation. *Id.* at *20-21. The same is true here.

To distract from their underpayments, the Zinettis assert Ocwen borrowed from their escrow account to cover principal and interest. The loan documents expressly *require* that – *i.e.* apply payments to interest, then principal, and lastly to escrow.[9] Because the Zinettis underpaid for years, Ocwen had less to allocate. By allocating to principal and interest, consistent with the mortgage, and allowing a negative escrow balance, Ocwen kept them from defaulting earlier.

Ironically, Angela Zinetti's *own* calculations confirm the reasonableness of Ocwen's billing. She undertook her own analysis, where for each year she combined the taxes and insurance and divided by twelve to get the monthly payment. She then multiplied that number by two to calculate the total cushion. From there, she divided the cushion by twelve to see what needed to be added monthly. (SMF at 13 and Ex. 4). Her math, however, failed to account for any escrow shortage or deficiency. Regardless, her calculations show that Ocwen's escrow billing (excluding shortages) was appropriate. Indeed, for each year Ocwen billed *less* than she calculated was due:

---

[9] The Note provides each payment "will be applied to interest before Principal." The mortgage states that payments "shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) [escrow] amounts due". *See* Flannigan Dec. Exs. B and C.

| Year | Zinetti monthly amount with cushion[10] | Ocwen monthly amount with cushion (excluding shortage) |
|------|------|------|
| 2011 | $162.51 | $158.20 |
| 2012 | $161.76 | $159.80 |
| 2013 | $171.39 | $162.52 |
| 2014 | $188.90 | $161.76 |
| 2015 | $206.37 | $188.88 |

Even by the Zinettis' *own* calculations, therefore, Ocwen did not over-bill their escrow. The Zinettis never appreciated, and thus never accounted for, shortage. While true that the accounting records are detailed and extensive given Zinettis' account history, complexity does not create an issue of material fact. And the records *confirm* Ocwen accurately billed the Zinettis. Since the Zinettis cannot establish that Ocwen improperly billed their escrow account, all of their remaining claims fail and the Court should grant summary judgment in Defendants' favor.

**B.     The FDCPA Claims (Counts III, IV and V) Fail because Ocwen is Neither a Debt Collector Nor Engaged in Improper Debt Collection Activity.**

**1.     Ocwen is Not a Debt Collector**

Ocwen is not a debt collector, and thus, the FDCPA claims fail as the FDCPA applies only to "debt collectors." D.I. 25 at 13 (citing *Tepper v. Amos Fin., LLC*, 898 F.3d 364, 365-66 (3d Cir. 2018)). "Debt collectors" are defined as any person (1) "who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts" (the "principal purpose" definition); or (2) "who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another (the "regularly collects" definition)." *Id*. Ocwen is a mortgage loan servicer.[11] Its principal purpose is not debt

---

[10] Angela Zinetti's numbers are yearly calculations, whereas the timing of Ocwen's analyses varied and thus do not run January to December. However, if compared, it is clear Ocwen billed less each annual cycle than even Angela Zinetti would have for the target monthly payment and cushion.

[11] "By the end of 2013, Ocwen had become the fourth largest mortgage servicer in the U.S." *City of Cambridge Retirement System v. Altisource Asset Management Corp.*, 908 F.3d 872, 875 (3d Cir. 2018).

collection and it does not regularly collect debts owed or due another---there is no issue of fact about this.  Numerous courts have concluded mortgage servicing companies are generally not debt collectors under the FDCPA. *See Gunn v. Specialized Loan Servicing LLC*, 2017 WL 976621, at *5 (D. Del. Mar. 13, 2017); *see also Scott v. Wells Fargo Home Mortgage, Inc.*, 326 F. Supp. 2d 709, 717-18 (E.D. Va.), *aff'd. mem.*, 67 Fed. Appx. 238 (4th Cir. 2003) (mortgage lenders are not debt collectors). In the Third Circuit, for an entity to be a debt collector under the "principal purpose" requirement, it must be an entity which "has the collection of any debts … as its ***most important aim***." *Barbato v. Greystone Alliance, LLC*, 916 F.3d 260, 267 (3d Cir. 2019) (emphasis added). Ocwen is a mortgage servicer. Its principal purpose and most important aim is to service mortgages on behalf of investors, not to collect debt.[12] Flanigan Dec. at ¶ 4.

To survive summary judgment, evidence must exist to support that a party "regularly collects" debt in order to satisfy the second definition. *Ramos v. Wells Fargo Bank, N.A.*, 2019 WL 2743454, at *4-5 (D.N.J. Apr. 24, 2019). When asked to identify all facts supporting their contention that Ocwen "regularly collects debts for another" the Zinettis only identified that, as a mortgage servicer, Ocwen included a warning it was a debt collector in certain communications. *See* Ex. 1 Plaintiffs response to Interrogatory 21. Thus, the Zinettis' evidence that Ocwen regularly collects debts for another is that the loan was previously in default and some communications from Ocwen have debt collector warnings. That boilerplate language is not enough to turn Ocwen into a debt collector.[13] The Zinettis' contention fails.

---

[12] The Zinettis *admit* that Ocwen is a "service provider for mortgage companies." Ex. 1. The Zinettis do not offer evidence that Ocwen's primary purpose is debt collection.

[13] Although this Court, in *Tabb v. Ocwen Loan Servicing, LLC*, WL 1012004, at *3 (D. Del. March 4, 2019), held on a motion to dismiss that it was plausible to infer defendant was a debt collector when it self-identified as such in several notices, identifying as a debt collector does not make one a debt collector under the FDCPA. *See Alamo v. ABC Financial Services, Inc.*, 2011 WL 221766,at *5 (E.D. Pa. Jan. 20, 2011) (using debt collection disclaimer language in letters did not make a loan servicer a debt collector); *see also Prince v. NCO Financial Services, Inc.*, 346 F. Supp. 2d 744, 751 (E.D. Pa. 2004) (finding debt collection

### 2. The Zinettis do not Allege Activity Violative of the FDCPA.

Even if the Court concludes there is a factual issue as to whether Ocwen is a debt collector, Ocwen could not have violated the FDCPA if it only collected amounts properly due. The Zinettis do not challenge Ocwen's collection methods. Instead, they challenge only the amounts sought, alleging in Count III, Ocwen assessed "fees and charges, including inflated escrow fees." (Compl. ¶ 65). As the overwhelming evidence reflects, Ocwen did no such thing. Rather, the Zinettis failed to make *required* payments, rendering them delinquent and subject to late fees and collection fees.

The Zinettis assert in Count IV that Ocwen failed to cease collection on "disputed" debt in violation of 15 U.S.C. § 1692g(b). (Compl. ¶ 69 ). They allege Ocwen charged them "with property inspection fees, late fees and interest, and by holding the Zinettis' payments in a suspense account." (*id*). But the mortgage expressly *permits* the collection of fees for a delinquent loan: "Lender may charge Borrower fees for services performed in connection with Borrower's default … including … property inspection and valuation fees." See Ex. C to Flannigan Dec. The mortgage also specifies that Ocwen can hold insufficient payments in suspense as it "may accept any payment or partial payment insufficient to bring the Loan current … Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current." *Id.* Thus, Ocwen was permitted to both place insufficient payments in unapplied status suspense until it received additional funds, and assess fees resulting from the default.

---

disclaimer language is not an admission rendering the party a debt collector in granting summary judgment that there was no evidence defendant was a debt collector); *Martin v. Select Portfolio Servicing Holding Corp.*, 2008 WL 618788, at *5 (S.D. Ohio Mar. 3, 2008) (mortgage servicer's self-identification on communications with borrower that it was a debt collector did not make it one under the FDCPA); *Gatling v. CitiMortgage, Inc.,* 2012 WL 3756581, *9 (S.D. Tex. 2012) (self-identification as a debt collector does not make one a debt collector*). Thus, that Ocwen may have included disclosures on communications with the Zinettis does not render Ocwen a debt collector under the FDCPA.

The Zinettis' allegation in Count V that Ocwen "failed to report Plaintiffs dispute regarding their account to the credit reporting bureaus, and has continued to communicate adverse information to credit agencies which it knew or should have known was false, in violation of 15 U.S.C. § 1692e(8)" (Compl. ¶ 72 ), fails as a matter of law. First, Ocwen had no affirmative duty to "disclose [to a credit reporting agency] that [the consumer-plaintiff] had disputed the debt." *Davenport v. Capio Partners LLC*, 2021 WL 1666977, at *6 (M.D. Pa. Apr. 28, 2021). Second, the Zinettis fail to identify any incorrect information Ocwen allegedly reported. It is undisputed the Zinettis have not made a mortgage payment since 2015. While they may dispute the *cause* of the delinquency, having not made *any* payments for over three years, they were indisputably delinquent in 2018. Finally, even though it had no obligation to do so, Ocwen did, in fact, mark their account as disputed from September 2017 through May 2019. Flannigan Dec. at ¶ 42.[14]

### 3.    Count IV is also Time Barred.

The Zinettis also assert Ocwen violated FDCPA §1692g(b) (Compl. ¶ 68), which states:

> If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) that the debt, or any portion thereof, is disputed, … the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector.

But they disregard that the thirty-day period is triggered by the "initial communication with a consumer in connection with the collection of any debt." 15 U.S.C. §1692g(a). Ocwen's initial communication to the Zinettis occurred in 2015, when the loan went into default. (SMF at 28.) As

---

[14] Ocwen notified credit reporting agencies of the dispute with the "XB" code, which reports "Account information disputed by consumer under the Fair Credit Reporting Act Definition.".  OCWEN00193-1943; *Ingram v. Experian Information Solutions, Inc.*, 2021 WL 2681265, at *3 (E.D. Pa. June 30, 2021).

a result, the 30-day period falls well outside the one-year statute of limitations. 15 U.S.C. § 1692k. Moreover, the Zinettis have not established that they disputed the debt within 30 days of the initial 2015 letter, or that Ocwen failed to adhere to §1692g(b) by ceasing collection until the debt was verified. In short, the Zinettis not only rely on an inapplicable debt validation procedure in Count IV, but their claim is also time-barred. For these reasons, the Court should award summary judgment to Ocwen on Counts III, IV and V.

### C.   The Zinettis Cannot Show Failure to Conduct a Reasonable Investigation or the Required Pattern and Practice Necessary to Support a claim Under RESPA.

The Zinettis' RESPA claim fails because Ocwen did not commit any errors in escrow billing. The RESPA claim fails for additional, independent reasons. First, Ocwen investigated the notices of a supposed error. The Zinettis' real grievance is that they disagreed with the *results* of the investigations, but that does not support a claim. Moreover, the Zinettis' repeated submission of the same notice of error did not obligate Ocwen to investigate duplicative requests. Finally, the Zinettis have not presented any evidence of a pattern and practice of non-compliance.

Upon receipt of a notice of error, a servicer must either correct the alleged error or "conduct[] a reasonable investigation" and determine no error occurred. 12 C.F.R. § 2024.35(e)(1)(i). If it conducts a reasonable investigation and finds no error, the servicer is required to include in its response "a statement of the reason or reasons for this determination." *Wilson v. Bank of America, N.A.*, 48 F. Supp. 3d 787, 804 (E.D. Pa. 2014). "A reasonable explanation of the servicer's belief is sufficient, even if it is later determined that the belief is erroneous." *Vassalotti v. Wells Fargo Bank, N.A.*, 732 F. Supp. 2d 503, 509 (E.D. Pa. 2010). RESPA does not require the servicer provide the resolution or explanation desired by the borrower; it simply requires the servicer provide a statement of its reasons. *Whittaker v. Wells Fargo Bank, N.A.*, 2014 WL 5426497, at *8 (M.D. Fla. Oct. 23, 2014). Although obliged to fairly meet the

substance of the notice of error, a servicer is not "compelled to guess what the [borrower] believed were the errors in the account or to dream-up and refute hypothetical reasons for the [borrower's] vague discontent." *Russell v. Nationstar Mortg, LLC*, 2015 WL 5819663, at *7 (S.D. Fla. Oct. 6, 2015) (internal quotation omitted). Nor did Congress intend for § 2605(e)(2) "to operate in hindsight as a 'gotcha' – essentially enabling borrowers to tie the hands of loan servicers 'by inundating a lender with qualified written requests until they receive a single unsatisfying response.'" *Russell*, 2015 WL 5819663, at *4.

The Zinettis submitted seven separate but duplicative notices of error ("NOE") between 2014 and 2018. (SMF at 22-35.) The statute of limitations expired with regard to their first three NOE letters. (D.I. 25). Ocwen therefore addresses only NOEs four through seven, to which Ocwen appropriately responded to each. Indeed, for NOEs four through six, Ocwen conducted investigations disputing the alleged errors, and notified the Zinettis accordingly. (SMF at 32-35.) In each response, Ocwen also provided requested documents and information. (*id*.) For the seventh NOE, Ocwen appropriately replied it was a duplicative request. *See* 12 C.F.R. § 1024.35(g) (a servicer is *not* required to respond to multiple notices from the same borrower that relate to identical alleged errors). Ocwen satisfied its statutory requirements under RESPA. The Zinettis cannot succeed on a statutory violation claim because they did not like the outcome of Ocwen's investigations. *McCray v. Bank of Am., Corp.*, 2015 WL 3487750, at *11 (D. Md. June 1, 2015) (RESPA claim should be dismissed if the servicer responded to the inquiry and plaintiff's only basis to challenge the response is a disagreement with the investigation's results).

To trigger statutory damages, a plaintiff must establish a pattern or practice of non-compliance with RESPA. 12 C.F.R. § 2605. A plaintiff must show the alleged violations were the standard or routine way of operating for the non-compliant servicer. *See McLean v. GMAC Mortg.*

*Corp.*, 595 F. Supp. 2d 1360, 1365 (S.D. Fla. 2009); *see also Croskrey v. Ocwen Loan Servicing LLC*, 2016 WL 3135643, at *12 (C.D. Cal. June 2, 2016) (granting summary judgment on statutory damages as no facts demonstrated defendants engaged in a pattern or practice of noncompliance); *Wenzel v. National Creditors Connection, Inc*, 2018 WL 1902699, at *7 (D.N.H. Apr. 20, 2018) (offering only data from CFPB and finding corporate representative testimony insufficient to create a triable issue of fact as to pattern and practice). No reasonable jury can find Ocwen's detailed responses to the Zinettis' inquiries established a pattern or practice of non-compliance. *See Rakestraw v. Nationstar Mortg., LLC*, 2021 WL 3716656, at *11-12 (N.D. Ga. Mar. 19, 2021). Summary judgment is appropriate where a plaintiff only offers evidence of a RESPA violation committed on his account. *See Bulmer v. Midfirst Bank, FSA*, 59 F. Supp. 3d 271, 279 (D. Mass. 2014); *see also Lewis v. PNC Bank, N.A.*, 2018 WL 6249989, at *8 (S.D. Ohio Nov. 29, 2018) (plaintiff must present evidence of violations involving other borrowers for pattern and practice); *Miranda v. Ocwen Loan Servicing, LLC*, 148 F. Supp. 4 1349, 1356 (S.D. Fla. 2015). Here, the Zinettis offer only Ocwen's responses to the four NOEs as evidence of pattern or practice. Thus, they have no evidence supporting their claim of "pattern and practice."[15]

### D. The Zinettis' Breach of Contract Claim is Time-Barred.

The Zinettis' breach of contract claim also fails on statute of limitations grounds. In Delaware, the statute of limitations for breach of contract is three years. *Millet v. Truelink, Inc.*, 2006 WL 2583100, at *5 (D. Del. Sept. 7, 2006) (citing 10 *Del. C.* § 8106). The Zinettis' breach

---

[15] To the extent the Zinettis attempt to rely upon CFPB complaints or other civil actions, courts have made clear that such complaints "do not equate to 'noncompliance." *Bennett v. Nationstar Mortg., LLC*, 2015 WL 5294321, at *12 (S.D. Ala. Sept. 8, 2015); *see also Davis v. Deutsche Bank National Trust Co.*, 2017 WL 6336473, at *7 (E.D. Pa. Dec. 12, 2017) (noting the court has no way to discern whether a defendant's alleged violations with other customers support a pattern or practice of failing to respond to qualified written requests). In *Bennett*, for example, the court rejected a claim for statutory damages where a borrower cited over 20 CFPB complaints of a particular category. 2015 WL 5294321, at *12. The Zinettis must make their own case, not piggyback on the allegations of others.

of contract claim dates back to 2013 and is now time-barred. The Zinettis themselves maintain

their claim accrued in 2013, but certainly no later than July 2015. (SMF at 29.) The Zinettis contend

that Ocwen improperly billed escrow immediately after the prior settlement in 2013. The clock on

the breach of contract claim, therefore, started in 2013, and certainly no later than July 2015 when

Ocwen refused to accept further payments. These events happened more than three years prior to

the filing of this action in 2019. The breach of contract claim is time-barred.

## V.   __CONCLUSION__

For all these reasons, Defendants request the Court grant their motion for summary

judgment and enter judgment on all remaining claims in their favor and against Plaintiffs.

<div style="margin-left:45%">

STRADLEY RONON
STEVENS & YOUNG, LLP

_/s/ Joelle E. Polesky_
Joelle E. Polesky (ID No. 3694)
1000 N. West Street Suite 1279
Wilmington, DE 19801
Telephone: (302) 295-4856
Facsimile: (302) 295-4801
Email: jpolesky@stradley.com

_Attorneys for Defendants_
_Deutsche Bank National Trust Company, as_
_Trustee For Saxon Asset Securities Trust_
_2007-3, Mortgage Loan Asset Backed_
_Certificates, Series 2007-3 and Ocwen Loan_
_Servicing, LLC_

</div>

OF COUNSEL:

Walter J. Buzzetta (_admitted pro hac vice_)
Stradley Ronon Stevens & Young, LLP
2000 K Street, Suite 700
Washington, D.C. 20006
Telephone: (202) 507-6407
Email: wbuzzetta@stradley.com

Dated: April 18, 2022