IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | : | |
|---|---|---|
| DEAN ZINETTI AND ANGELA K. ZINETTI, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | C.A. No. 1:19-cv-01279-WCB |
| v. | : | |
| | : | |
| DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR SAXON ASSET SECURITIES TRUST 2007-3, MORTGAGE LOAN ASSET BACKED CERTIFICATES, SERIES 2007-3; and, OCWEN LOAN SERVICING, LLC, | : | |
| | : | |
| Defendants. | : | |

**STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants, Deutsche Bank National Trust Company, as Trustee for Saxon Asset Securities Trust 2007-3, Mortgage Loan Asset Backed Certificates, Series 2007-3 and Ocwen Loan Servicing, LLC (collectively, "Defendants"), set forth their Statement of Undisputed Material Facts in support of their Motion for Summary Judgment (filed contemporaneously with this Statement) as follows:

1. The Zinettis own the property located at 16492 Old Furnace Road, Georgetown, Delaware. (Compl. ¶ 1). They purchased the property through a loan originated with Saxon Mortgage, Inc. in 2007 (*Id*. ¶ 8). The Zinettis executed both a note and a mortgage with an adjustable interest rate as part of the transaction. Declaration of Kevin Flannigan ("Flannigan Dec.") at ¶ 11. The Note and Mortgage are also attached as Exhibits B and C to the Flannigan Declaration.

2. Pursuant to the terms of the note and mortgage, the Zinettis were obligated to make monthly payments, including principal, interest and escrow, although Saxon did not originally collect for escrow. The Zinettis were responsible for paying their real estate taxes and insurance premiums. See attached as Exhibit 1 Plaintiffs Response to Request for Admission at Request 17; see also attached as Exhibit 2 excerpts from the Deposition Transcript of Dean Zinetti at 38:17-20; 51:14-52:3 and Exhibit 3, excerpts from the Deposition Transcript of Angela Zinetti at 45:14-17.; 52:10-53:2. The Zinettis were also responsible for fees for any untimely payments. Ex. 2 at 38:21-40:1; Ex. 3 at 45:18-21; 46:11-47:5.

3. Saxon Mortgage Services, Inc. ("Saxon") originally serviced the loan (Compl. ¶ 9). In 2010, while Saxon was servicing, the Zinettis entered into a modification agreement with a lower adjustable interest rate through the Home Affordable Modification Program ("HAMP"), a program introduced by the federal government in 2009 to help struggling homeowners. As part of their modification, the Zinettis agreed to an adjustable interest rate and – for the first time –to start paying monthly into escrow an amount sufficient to cover their prospective property taxes and homeowner's insurance, plus two months' cushion. (*Id.* ¶ 15). Flannigan Dec. at ¶¶ 12-13 and Ex. D.

4. An escrow account is the account established for the payment of property taxes and insurance. The account is funded by escrow payments that are billed along with principal and interest. 12 U.S.C. § 2602(g); 12 C.F.R. § 1024.17. HAMP modifications required loans have escrow accounts, and that servicers take steps to avoid escrow shortages. Flannigan Dec. at ¶ 13.

5. In connection with their application for the modification, Saxon prepared an initial escrow analysis in September 2009. Saxon estimated real estate taxes at $893 annually, and

effective January 1, 2010, set a monthly escrow payment at $99.28 ($74.46 plus $24.82 for shortage). Flannigan Dec. at ¶ 13 and Ex. E. *See also* Flannigan Dec. Ex. A at line 42.[1].

6.  Saxon failed to account for homeowners insurance in its initial analysis. So, when it sent the loan modification agreement to the Zinettis in January 2010, Saxon advised the Zinettis that their monthly escrow payment would be increased from $99.28 to $343.15, as Saxon's updated analysis reflected a $2,175 shortage after including insurance. Flannigan Dec. at ¶ 14 and Exs. D and F.

7.  Saxon conducted its next escrow analysis in December 2010. That analysis revealed that Saxon's insurance estimate had been high and resulted in a surplus in the escrow account. Saxon accordingly returned $2,020.11 to the Zinettis and set the new monthly escrow payment at $135.60, effective February 1, 2011. Flannigan Dec. at ¶ 15 and Ex. G and Ex. A at line 74.

8.  In April 2011, Saxon determined that it had erred in calculating the Zinettis' principal and interest payments under the loan modification. As a result, Saxon reversed the Zinettis' fifteen (15) monthly payments from January 2010 to April 2011, leaving a negative escrow balance of $4,383.33, along with a suspense balance of $19,181.28. The total of those two numbers reflected the entirety of the Zinettis' payments and escrow obligations over that 15-month period. Flannigan Dec. at ¶ 16 and Ex. G and Ex. A at lines 87-104.

9.  Saxon intended to perform an account reconciliation and to re-apply the funds from the suspense account and, in the process, adjust for any escrow deficiencies or surpluses. Saxon

---

[1] This account reconciliation is a manual reconciliation of every payment and disbursement entry on the Zinettis' account from inception of their loan through their default in July 2015. The reconciliation was prepared using the complete payment histories of Saxon and Ocwen, as well as reviewing the account notes for the Zinettis' loan to ensure that the entries accurately represented the transaction and Ocwen's records. Flannigan Dec. at ¶ 10.

never did this, however, because Ocwen took over for Saxon as the servicer on the account on May 17, 2011. Flannigan Dec. at ¶ 17.

10. When Ocwen took over as the servicer on the loan, the Zinettis' account appeared to be delinquent, reflecting past due payments going back to January of 2010. Ocwen first reapplied payments for February 1, 2010 through October 1, 2010 using $2,018.95 as the monthly payment. Flannigan Dec. at ¶ 18 at Ex. A at lines 105-113. This application resulted in a delinquent account. Thus, when the Zinettis submitted their June 2011 and July 2011 monthly payments, Ocwen returned those payments to them as insufficient to cure the deficiency. Flannigan Dec. at ¶ 18 at Ex. A at 118-123.

11. It is undisputed that the Zinettis never re-submitted those two monthly payments. Flannigan Dec. at ¶ 19 and Ex A generally.

12. Ocwen subsequently realized that it had not reapplied the February 2010 to October 2010 payments according to the terms of the modification. By September 2011, Ocwen performed the reconciliation that Saxon failed to do. Namely, Ocwen applied the suspense funds – this time using the correct principal and interest figures – and also applied previously paid amounts to the escrow account using the $99.28 monthly escrow figure from Saxon's first escrow analysis. Flannigan Dec. at ¶ 20 at Ex. A at 125-197.

13. In September 2011, Ocwen then conducted a new escrow analysis which resulted in a new monthly payment of $136.97 before calculating shortage or deficiency. The reconciliation revealed a deficiency and anticipated shortage of $3,517.50. To assist the Zinettis, Ocwen spread the deficiency and shortage amount over 60 months, adding $58.63 (the $3,517.50 deficiency and shortage amount divided by 60) to the new escrow calculation ($136.97) for a total monthly escrow payment of $195.60. Ocwen shared this amount and the related calculations with the Zinettis.

4

Thus, the new monthly escrow payment was $195.60 starting November 1, 2011. Ocwen shared this amount and the related calculations with the Zinettis. The Zinettis failed to make the required payments. Instead, they stubbornly made monthly payments *for the next four year*s that were each between $60 and $164.75 *less* than what was due on their account. This was in part based on Angela Zinetti's personal calculations of what she believed was due for escrow. Those calculations are attached hereto as Exhibit 4. Flannigan Dec. at ¶ 21 and Ex. H and Ex. A at line 202.

14. In August 2012, Ocwen's escrow analysis reflected a new monthly target payment (exclusive of shortage) of $139.30. As a result of the Zinettis' persistent underpayments, the escrow shortage – which was $3,106.70 as of October 2011 – had only slightly decreased to $2,269.10 as of August 2012. Ocwen again made the Zinettis aware of the shortage. This time, Ocwen agreed to spread the shortage over 48 months, for a monthly shortage payment of $71.98. Together with the new monthly target of payment of $139.30, the monthly escrow requirement effective October 1, 2012, became $211.28. Flannigan Dec. at ¶ 22 and Ex. I and Ex. A at line 220.

15. Earlier in January 2012, the Zinettis disputed their loan status and payment amounts and filed suit against Ocwen and Saxon alleging that Saxon and Ocwen had improperly billed escrow for the Zinettis' account and both servicers had violated the Fair Credit Reporting Act having reported the Zinettis' delinquency to the credit reporting agencies. (Compl. ¶ 28; Ex. M) The parties settled that suit by written agreement dated March 6, 2013. (*Id.* ¶ 30). The Zinettis believed that as part of the settlement their escrow account would be brought current, despite the absence of language in the agreement to that effect. Flannigan Dec. at ¶ 23 and Ex. J and Ex. A; Ex. 2 at 110:3-10; 66:16-67:4; Ex. 3 at 105:22-106:12. 110:12-16.

16. As part of the settlement, Ocwen agreed to conduct a new escrow analysis, although there was no pre-determined or contractually-agreed upon outcome for that analysis as part of the

settlement agreement. In exchange for that agreement that Ocwen would conduct a new analysis, the Zinettis agreed to fully and finally release Ocwen from any existing liability related to the escrow account. Ocwen performed the required review on March 7, 2013, and that analysis *confirmed* the prior calculations and revealed a new monthly escrow payment of $138.65, along with an existing total shortage of $3,294.27. Ocwen *again* advised the Zinettis of the shortage and *again* agreed to spread the shortage out over 48 months, for a monthly shortage payment of $68.63. This brought the new monthly escrow requirement to $207.28. Flannigan Dec. at ¶ 24 and Ex. K and Ex. A at line 240).

17.     The Zinettis misunderstood the terms of the settlement agreement. First, they clearly expected to be "current" as of the date of the settlement, even though that is not stated in the agreement, and nothing in the agreement suggests that the Zinettis' many underpayments would be somehow waived or "zeroed out." Moreover, the Zinettis expected that a "reconciliation" of their escrow account meant that Ocwen would alter its payment history. However, the agreement does not require that. Additionally, this is not something that Ocwen would ever do. Ocwen's payment records use a ledger system whereby each entry is made in the ledger at the time it occurs. If there is an error with an entry, the entry is not deleted and re-entered, it is adjusted through a later entry. This is clear from both the payment histories produced throughout the years in this case, as well as the complete manual reconciliation. Ocwen uses a reversal or credit entry to make adjustments. Flannigan Dec. at ¶ 25; see also Ex. 2 at 110:3-10; 66:16-67:4; Ex. 3 at 105:22-106:12. 110:12-16.

18.     After the settlement, consistent with that agreement, Ocwen credited the Zinettis' account for $1,142.46 for prior charged fees and also waived $119.94 in late fees. Flannigan Dec. at ¶ 26 and Ex. at lines 251-252.

19. The Zinettis do not contend that there were any errors in their escrow calculations after March 2013. Yet they continued to underpay each month. From November 2011 to July 2015 – *a period of 44 months* – the Zinettis failed to pay the amount they were billed. They held their monthly payment steady at $935.22 – even in the face of increases to $1,010.90 (October 2012), to $1,006.90 (March 2013), to $1,138.55 (November 2014), and to $1,264.76 (January 2015). The Zinettis never adjusted their payments to match the amounts billed, even ignoring interest rate adjustments. They did unilaterally (and arbitrarily) increase their monthly payment to $1,000 beginning May 2014, and then to $1,100 beginning January 2015. Flannigan Dec. at ¶ 27.

20. In July 2013, the Zinettis disputed Ocwen's escrow accounting again with the Delaware Department of Justice. In September 2013, in response to an inquiry by that agency, Ocwen provided a full and complete explanation of its escrow billing along with all prior escrow analyses. Satisfied with Ocwen's detailed accounting and explanation, the Department of Justice has made no further inquiries. Flannigan Dec. at ¶ 28 and Ex. L.

21. As a result of their cascading underpayments (and notwithstanding Ocwen's repeated attempts to spread out the deficiencies over several years), the Zinettis' account tumbled into default by July 23, 2015, at which point they were delinquent in the amount of $4,503.35 (or more than 3 monthly payments behind). The Zinettis have not made *any* mortgage payments since 2015. Flannigan Dec. at ¶ 29.

22. On July 18, 2014, the Zinettis' counsel sent the first alleged Notice of Error ("NOE") letter. Compl. at ¶ 37; Flannigan Dec. at ¶ 30.

23. Ocwen responded to the first NOE with copies of the escrow and payment history. According to its account notes, in order to respond to the NOE, Ocwen conducted an analysis of the escrow account. Flannigan Dec. at ¶ 31 and Ex. M.

24. In September 2014, Ocwen conducted an annual escrow analysis and adjusted the monthly payment to $338.83 ($161.91 plus $176.92 shortage). Flannigan Dec. at ¶ 32 and Ex. M and Ex. A at line 297.

25. On January 1, 2015, the monthly principal and interest payment increased under the modification to $1,138.28. Flannigan Dec. at ¶ 33, Ex. D and Ex. A at line 304.

26. On May 12, 2015, the Zinettis' counsel sent a second NOE. The letter disputes the amount in the monthly billing statement and requests a payment history, escrow history and annual escrow statements. Flannigan Dec. at ¶ 34.

27. On May 29, 2015, Ocwen responded and explained the charges and escrow requirements, along with sending the requested documents. Flannigan Dec. at ¶ 35.

28. As of July 1, 2015, the Zinettis' account was more than 90 days delinquent. Ocwen returned the Zinettis' monthly payments beginning in July 2015. (Flannigan reconciliation lines 327). The Zinettis have not made a mortgage payment since then. At this time, Ocwen accelerated the Zinettis' loan and sent its initial communication to the Zinettis concerning their default. Flannigan Dec. at ¶ 36. Ex. 2 at 76:18-21 and 77:15-18:12; Ex. 3 at 177:6-9 and 198:3-24.

29. The Zinettis admit that they believed that Deutsche Bank had breached the terms of the modification and mortgage as of July 2015. "Deutsche Bank was already in breach before such date, due to misapplication of Plaintiffs' payments." Ex. 1 at Response 19. Indeed, the Zinettis believed Deutsche Bank was in breach as early as March 2013. Ex. 1 at Response 20. Ex. 2 at 128:20-129:9; Ex. 3 at 95:4-9 and 98:12-99:14.

30. On October 28, 2015, the Zinettis sent a third NOE letter, to which Ocwen responded. Flannigan Dec. at ¶ 37.

31. The Zinettis then did not take any action to dispute their account for over two and half years. Ex. 2 at 137:16-20; Ex. 3 at 151:2-12.

32. On April 4, 2018, new counsel for the Zinettis sent a fourth NOE letter.[2] Ocwen responded to the fourth NOE. Ocwen's account notes indicate that Ocwen requested Saxon documents to respond, multiple individuals worked on the response over several weeks, and that the response letter was reviewed for quality control before being approved and sent. Flannigan Dec. at ¶ 38.

33. On June 11, 2018, the Zinettis sent a fifth NOE letter. Ocwen responded to the fifth NOE letter. Ocwen's account notes indicate that Ocwen obtained an escrow breakdown to respond to the letter, and that the response included a complete explanation of the outstanding principal, interest and escrow amounts for the Zinettis' account. Flannigan Dec. at ¶ 39. The Zinettis admit that all information requested was provided in Ocwen's response. Ex. 2 at 180:19-182:7.

34. On August 27, 2018, the Zinettis sent a sixth NOE letter. Ocwen responded to the sixth NOE letter. Ocwen's account notes confirm that eight individuals worked on the response, and that as part of the investigation to provide a response Ocwen conducted a new escrow analysis. As a result of the investigation, Ocwen confirms in its response that there was no error in Ocwen's escrow records. Flannigan Dec. at ¶ 40.

35. On November 30, 2018, the Zinettis sent a seventh NOE letter. Ocwen responded to the seventh NOE letter. Again, Ocwen's account notes confirm that three individuals researched and worked on the response. As part of the investigation Ocwen specifically reviewed implementation of the HAMP agreement and the escrow account. Flannigan Dec. at ¶ 41.

---

[2] The Court has already determined that the statute of limitations expired for the Zinettis first three NOE letters, and that the Zinettis' RESPA claim only applies beginning with the fourth NOE. (D.I. 25.)

36.     On June 1, 2019, servicing for the Zinettis loan transferred from Ocwen to PHH.

Flannigan Dec. at ¶ 42.

|  | STRADLEY RONON STEVENS & YOUNG, LLP |
|---|---|
|  | /s/ Joelle E. Polesky |
|  | Joelle E. Polesky (ID No. 3694) |
|  | 1000 N. West Street Suite 1279 |
| OF COUNSEL: | Wilmington, DE 19801 |
|  | Telephone: (302) 295-4856 |
| Walter J. Buzzetta (*admitted pro hac vice*) | Facsimile: (302) 295-4801 |
| Stradley Ronon Stevens & Young, LLP | Email: jpolesky@stradley.com |
| 2000 K Street, Suite 700 |  |
| Washington, D.C. 20006 | *Attorneys for Defendants* |
| Telephone: (202) 507-6407 | *Deutsche Bank National Trust Company, as* |
| Email: wbuzzetta@stradley.com | *Trustee For Saxon Asset Securities Trust 2007-3, Mortgage Loan Asset Backed Certificates, Series 2007-3 and Ocwen Loan* |
| Dated: April 18, 2022 | *Servicing, LLC* |

5572069