# EXHIBIT 2

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF DELAWARE

3

4        DEAN ZINETTI AND ANGELA K.    )
         ZINETTI                       )
5                                      )
              Plaintiffs               )
6                                      )
         v.                            )  Civil Action No.
7                                      )  1:19-01279-LPS-JLH
         DEUTSCHE BANK NATIONAL        )
8        TRUST COMPANY, AS TRUSTEE     )
         FOR SAXON ASSET SECURITIES    )
9        TRUST 2007-3, MORTGAGE        )
         LOAN ASSET BACKED             )
10       CERTIFICATES, SERIES          )
         2007-3; et al.                )
11                                     )
              Defendants               )
12

13

14          The Zoom deposition of DEAN F. ZINETTI was taken

15    pursuant to notice before Carrie Gold, Court Reporter, on

16    Wednesday, July 28, 2021, beginning at approximately

17    10:00 a.m., there being present:

18

19

20

21

22

           VERITEXT NATIONAL COURT REPORTING COMPANY
23                   MID-ATLANTIC REGION
              300 Delaware Avenue, Suite 815
24               Wilmington, DE 19801
                     302-571-0510

Page 5

1                    THE COURT REPORTER:  The attorneys

2     participating in this deposition acknowledge that I am

3     not physically present in the deposition room, and that I

4     will be reporting this deposition remotely.

5                         They further acknowledge that, in lieu

6     of an oath administered in person, I will administer the

7     oath remotely.

8                         The parties and their counsel further

9     agree that the witness may be in a state where I am not a

10    notary, and stipulate to the witness being sworn in by an

11    out-of-state notary.

12                        If any party does have an objection to

13    this manner of reporting, please state so now.

14                        (No response.)

15                   THE COURT REPORTER:  Hearing none, we

16    can proceed.

17                         -  -  -

18         DEAN F. ZINETTI, having first been duly sworn

19    according to law, was examined and testified as follows:

20                        EXAMINATION

21    BY MR. BUZZETTA:

22         Q.   Good morning, Mr. Zinetti.  My name is Walter

23    Buzzetta.  I apologize that my video is not working.  For

24    some reason, my webcam has failed this morning, but I

DEAN F. ZINETTI

Page 38

1      So he's getting some notification on his computer.  Is it

2      saying our bandwidth is low?

3                     THE WITNESS:  Yeah, it says your

4      bandwidth is low and it keeps breaking up.

5                     MR. ROBINSON:  It just broke up again,

6      Walter.  So, I'm sorry, if you could re-ask.

7                     MR. BUZZETTA:  That's fine.

8      BY MR. BUZZETTA:

9           Q.   Do you recall ever reviewing this note since

10     the time when you signed it in 2007?

11          A.   I believe in the past when we first started

12     the issues that we were having with the credit reporting,

13     that all of the paperwork we've had in regards to the

14     house and mortgage were looked over at one time or

15     another with me and my wife going through them, but I

16     couldn't tell you the exact date of when.

17          Q.   Okay.  When you signed this document, did you

18     understand that you'd be required to make monthly

19     payments?

20          A.   Yes.

21          Q.   Did you understand when you signed this

22     document that the lender could impose a late fee for any

23     untimely payment?

24          A.   Yes.

DEAN F. ZINETTI

Page 39

1       Q.   Did you understand that the lender could

2   charge a late fee for any payment that was a less than

3   full payment that was received?

4       A.   In regards to this application and loan, I do

5   not believe that was stated clearly to us, even though I

6   understand that to be part of the loan process for

7   various loans you can take out.

8       Q.   Did you understand that the lender would treat

9   anything, if it received less than a full monthly

10  payment, as late?

11      A.   No, I do not believe so.  Not at the time of

12  signing this document.

13      Q.   Has your understanding come to change since

14  the time you signed the document?

15      A.   After looking back at this years later and

16  reading through it, yes our understanding has changed.

17      Q.   And what is your present understanding?

18      A.   As you stated, that, basically, they can

19  charge us a late fee for anything they want to if they

20  don't get all the money due to them at said amount of

21  time.

22      Q.   Okay.  Did you understand when you signed this

23  document that the lender had the right to take certain

24  actions, including foreclosure, if you became delinquent?

DEAN F. ZINETTI

Page 40

1          A.    That is my understanding of every loan.

2          Q.    Okay.  I'm going to put that aside for now,

3     and I'm going to start marking Exhibit 2 if you want to

4     pull that from the Redweld.

5                    MR. ROBINSON:  Put that one back in

6     Exhibit 1 so they're kept organized.

7                    THE WITNESS:  Okay.  I have Exhibit 2.

8                    (A document was marked as Dean Zinetti

9     Exhibit 2 for identification.)

10    BY MR. BUZZETTA:

11         Q.    All right.  For the record, I've just

12    introduced and marked Exhibit 2.  This is a document

13    bearing the Bates label OCWEN000007 through 000027.

14    Mr. Zinetti, if you could take a moment to just flip

15    through the document and confirm that you have pages 007

16    through 027 in front of you?

17         A.    That is correct.

18         Q.    Do you recognize this document?

19         A.    It looks to be a mortgage loan, the legal

20    paperwork.

21         Q.    Directing your attention to the second-to-last

22    page bearing the Bates label at the bottom OCWEN000026,

23    do you recognize your signature on that page above a line

24    that has your name on it?

DEAN F. ZINETTI

Page 51

1    involved in the program or if it was first offered to

2    you?

3         A.   No, I requested.  Because I was the one that

4    initiated because I heard about it at work because

5    somebody else was going through a similar situation.

6         Q.   Do you recall who you heard about it from at

7    work?

8         A.   No.

9         Q.   Do you recall that you heard at work about the

10   program and you reached out to Saxon to initiate to see

11   if you could become eligible for it?

12        A.   It was either Saxon or a website.  I'm not

13   sure who it was through when I did the initial inquiries.

14        Q.   Do you agree that under the mortgage that you

15   agreed to, and that's Exhibit 2, that you're responsible

16   for monthly principal and interest?

17                  MR. ROBINSON:  Objection.  You can

18   answer.

19                  THE WITNESS:  I believe so.  That's how

20   a loan works.  You borrow money, and you pay it back with

21   interest.

22   BY MR. BUZZETTA:

23        Q.   Do you agree that under the mortgage you

24   agreed to, the lender can require escrow for both taxes

DEAN F. ZINETTI

Page 52

1      and insurance on the property?

2                      MR. ROBINSON:  Objection.

3                      THE WITNESS:  I believe so, yes.

4      BY MR. BUZZETTA:

5           Q.   Do you know how your wife made the monthly

6      payment on the mortgage?

7           A.   Can you rephrase the question?

8           Q.   Yeah.  Do you know if she used ACH transfers

9      or sent in a physical check, only if you know?

10          A.   All of -- to my knowledge, all of our banking

11     since we've been here in Delaware has been through USAA,

12     which is our bank, which she puts the due date in

13     prior -- or she puts the due date in of when the

14     payment's supposed to be, and the money is in the

15     account, and the bank then sends the check and guarantees

16     it's going to be there by the date of said due date.

17          Q.   And to your knowledge, you're not aware of

18     your wife using any other method to pay the mortgage,

19     cashier's check, money order, something along those

20     lines?

21          A.   No.  We've never paid anything other than with

22     USAA.

23          Q.   And you've always used USAA to pay your

24     mortgage?

DEAN F. ZINETTI

Page 66

```
 1    Legal Services at the behest of the last mediation that

 2    we went through, actually, I think, that you were part

 3    of.

 4         Q.   What facts do you have, just turning over from

 5    page 1 to page 2, that Ocwen failed to provide timely

 6    escrow analyses?

 7         A.   I mean, they never did any escrow analysis.

 8    Per the mediation that was done, the escrow was supposed

 9    to be brought up to current, and the accounts were

10    supposed to be wiped clean, and it never happened.  And

11    since then, it's just snowballed bigger and bigger.

12    There's never been an investigation.  To our knowledge,

13    nobody from Ocwen has ever reached out to do anything

14    reasonable in with regards to an investigation to get

15    information from us directly.

16         Q.   That's because you believe that, under the

17    prior agreement, the escrow balance was supposed to be

18    zeroed out?

19         A.   It wasn't supposed to be zeroed out.  It was

20    supposed to be brought current.

21         Q.   What's the difference?

22         A.   Zeroing out means there's zero balance.  Being

23    brought current is bringing the amount current because of

24    the amount that is due at the time to be in the account.
```

DEAN F. ZINETTI

Page 67

```
 1      But you'd have to actually read into the results of the

 2      mediation that prior counsel signed for to get all the

 3      legalese out of it.  But that is how I was instructed as

 4      what was going to happen.

 5           Q.   Is it your position that there have been times

 6      when you have requested an escrow analysis from Ocwen and

 7      have not received it?

 8           A.   I have not personally requested that escrow

 9      analysis.  To my knowledge, that was made through our

10      previous counsel per the communications that we were

11      trying to have with Ocwen when we were trying to resolve

12      this on a nicer basis.

13           Q.   Are you aware, sitting here today, of a time

14      where anyone on your behalf has requested an escrow

15      analysis from Ocwen and has not received it?

16           A.    Not to my knowledge.  I do not know what

17      information has been requested upon my behalf by my

18      counsel in regards to litigation of this claim.  Whatever

19      escrow analysis or paperwork was sent to us wasn't an

20      actual detailed analysis.  It was just a printout of

21      computer spreadsheets that they sent that were sent

22      through the attorney's office.

23           Q.   Go ahead and flip to paragraph 10 of the

24      complaint.
```

DEAN F. ZINETTI

Page 76

1      took over, and then now they're filing it as negative,

2      not making payments, bad reporting on the credit reports.

3             Q.   But you haven't made a mortgage payment since

4      2015.

5             A.   We have not been able to make a mortgage

6      payment since 2015 because the mortgage company has

7      refused our money.

8             Q.   When was the last time the mortgage company

9      refused your money?

10                      MR. ROBINSON:  Hold on.  He hadn't

11     finished his answer, Walter.

12                      THE WITNESS:  It was not for our lack of

13     paying the mortgage.  It was the mortgage company's

14     refusal to accept our payments based upon the agreed

15     contract of the HAMP and payouts of said interest rates

16     and everything.

17     BY MR. BUZZETTA:

18            Q.   When was the last time you attempted to make a

19     mortgage payment?

20            A.   I don't know the exact date, but it was

21     somewhere in the year of 2015.

22            Q.   Okay.  So you did not attempt --

23            A.   And then when those mortgage payments were

24     returned, we started setting those payments aside into a

DEAN F. ZINETTI

Page 77

1    separate bank account to -- at this point, we have excess

2    of $100,000 in the account that was supposed to be paid

3    to the mortgage company that has refused it.

4         Q.   You've never actually offered $100,000 to your

5    mortgage company?

6              MR. ROBINSON:  Objection.  I'm going to

7    instruct the witness not to answer the question if the

8    answer involves communications that took place in a

9    mediation session between parties that are confidential

10   and is not admissible evidence in any proceeding.  If you

11   can answer without divulging confidential mediation

12   communications, you can answer the question.

13             THE WITNESS:  I abstain from answering.

14   BY MR. BUZZETTA:

15        Q.   Have you offered to make a mortgage payment in

16   the year 2021?

17        A.   Why would I when the bank refused our payments

18   and sent them back since 2015?

19        Q.   You say "since 2015."  I'm asking have you

20   offered to make a payment in 2021?

21        A.   No, we have not.

22        Q.   Thank you.  Did you offer to make a payment in

23   2020?

24        A.   No.

DEAN F. ZINETTI

Page 78

1          Q.    Did you offer to make a payment in 2019?

2          A.    No.

3          Q.    Did you offer to make a payment in 2018?

4          A.    No.

5          Q.    Did you offer to make a payment in 2017?

6          A.    No.

7          Q.    Did you offer to make a payment in 2016?

8          A.    No.

9          Q.    At any time from 2016 to 2021, have you

10   offered to make a payment for the property taxes for your

11   property?

12         A.    Not that I'm aware of.

13         Q.    At any time since between 2016 and 2021, have

14   you offered to pay for the insurance on your property?

15         A.    I do not know.

16         Q.    You don't know if you've made an offer to

17   Ocwen to pay the insurance on your property between 2016

18   and 2020?

19         A.    I do not know an answer to that.  I know that

20   we have gotten insurance paperwork and bills due in

21   saying the insurance is due, so I don't know if Ocwen or

22   whichever mortgage company holder was paying bills

23   because the bills were coming due into us, and they were

24   forwarded to our legal counsel at the time.

DEAN F. ZINETTI

Page 88

1                    THE WITNESS:  I'm sorry.  What?

2      BY MR. BUZZETTA:

3           Q.   When did you first become aware of the Real

4      Estate Settlement Procedures Act?

5                    MR. ROBINSON:  Objection.

6                    THE WITNESS:  What is that?  I don't --

7      I'm not familiar with that term.

8      BY MR. BUZZETTA:

9           Q.   Okay.  How about the Fair Debt Collection

10     Practices Act?

11                   MR. ROBINSON:  Objection.

12                   THE WITNESS:  I believe I heard that

13     before when filing the complaint with the consumer -- the

14     CFPB website and the issues reporting was brought up

15     before, but I don't recall exactly when.

16     BY MR. BUZZETTA:

17          Q.   Okay.  What evidence do you have personally

18     that Ocwen is a debt collector?

19                   MR. ROBINSON:  Objection.

20                   THE WITNESS:  The -- it says in the

21     files in the paperwork that they're -- for collecting a

22     debt.  I want to -- I don't know where it was mentioned

23     in the interrogatories.

24     BY MR. BUZZETTA:

DEAN F. ZINETTI

Page 89

1          Q.   Okay.  Do you have any evidence that Ocwen's

2     primary purpose is to collect debt from third parties?

3                    MR. ROBINSON:  Objection.

4                    THE WITNESS:  That's beyond my scope of

5     knowledge to make any ascertainment as to whether that's

6     a true or false statement.

7     BY MR. BUZZETTA:

8          Q.   What is your basis for alleging that Ocwen

9     failed to put proper policies and procedures in place

10    reasonably designed to enable it to investigate, respond,

11    and to make corrections on accounts?

12                   MR. ROBINSON:  Objection.

13                   THE WITNESS:  Are you asking what proof

14    do I have Ocwen failed to do their job as stated by the

15    contract's obligations that we signed and -- with the

16    mortgage and the HAMP agreement and then the 2010

17    mediation?

18    BY MR. BUZZETTA:

19         Q.   I'll direct you.  It's paragraph 58 of your

20    complaint.

21         A.   Which exhibit is that?  I put Exhibit 5 back.

22         Q.   Exhibit 5.

23         A.   Okay.  Hold on.

24                   MR. ROBINSON:  I'm sorry, Walter.

DEAN F. ZINETTI

Page 110

1    provisions?

2         A.   Yes.

3         Q.   What did you believe was going to happen after

4    you entered into this agreement?

5         A.   That the account issues that we were having

6    with the billing would be brought to current.  The

7    numbers would make more sense, and that we would continue

8    paying on our -- based -- whatever loan -- whatever you

9    call the payout for a loan, then the credit would be

10   fixed.

11        Q.   Can you point to anywhere in this agreement

12   where it says that?

13                  MR. ROBINSON:  Objection.

14                  THE WITNESS:  Page 3, first sentence,

15   OLS shall make update.  Credit reporting -- state

16   agreement -- borrowers not default on loan from May '11,

17   the effective date of this agreement.

18   BY MR. BUZZETTA:

19        Q.   Okay.  I agree there are obligations here with

20   regard to making changes to the credit reporting.

21                  MR. ROBINSON:  Is that a question or a

22   statement of counsel?

23   BY MR. BUZZETTA:

24        Q.   How about this for a question.  You had the

DEAN F. ZINETTI

Page 128

 1   not get documents from Ocwen.  That is why we had to

 2   retain Legal Services again because I previously stated,

 3   every time when we were trying to get clarification and

 4   making phone calls, we were getting stonewalled without

 5   answers.

 6   BY MR. BUZZETTA:

 7       Q.   But at the same time, you have no recollection

 8   of receiving this, which was copied to you, which has

 9   numerous exhibits attached regarding your account just

10   months after the settlement in your case?

11                  MR. ROBINSON:  Objection.

12                  THE WITNESS:  I mean, you're asking me

13   to recollect one document out of the three and a half

14   boxes of documents that I've received over the last --

15   oh, since we've collected -- over the last ten years of

16   conversations going back and forth between us and counsel

17   and us directly prior to.  I cannot answer that question

18   right now.

19   BY MR. BUZZETTA:

20       Q.   Do you recall when you first became concerned

21   that the result of the mediation was not what you

22   expected it would be?

23       A.   That'd be 31 days after the mediation date

24   paperwork was signed.

DEAN F. ZINETTI

Page 129

1     Q.    When you got your first monthly statements?

2     A.    No.  When I had pulled my credit history after

3     mediation because they said it'd take 30 days to make

4     changes to credit reporting.

5     Q.    Okay.  So by your testimony, then, you believe

6     you were concerned no later than April of 2013?

7     A.    If that's roughly a date a month later, yes.

8     I don't know.  I don't have the signed date in front of

9     me.

10    Q.    Do you recall whether you or your wife reached

11    out to Ocwen at that time regarding that issue?

12    A.    After the month transpired, we -- one of us

13    contacted Ocwen to ask why wasn't the issue fixed because

14    that is one of the stipulations of it.  That was the main

15    reason for how we got to that point -- was my credit was

16    screwed up.  So when the credit still wasn't fixed, we

17    contacted Ocwen to get an answer to as to why, and I

18    believe the reason why we proceeded with seeking counsel

19    afterwards is because we were getting stonewalled with

20    answers and responses from Ocwen.

21    Q.    But you recall being concerned regarding the

22    credit reporting.  Do you recall whether, at the time,

23    you were concerned regarding the monthly billing?

24    A.    No.  I was more concerned about the credit

DEAN F. ZINETTI

Page 137

1          Q.   We'll go ahead and move on.  I can see from

2     the complaint and from the records in this case that

3     Legal Services of Delaware wrote three notice of error

4     letters to Ocwen in 2014, 2015, and you also made a CFPB

5     complaint in 2015.  Then there are no other

6     communications until 2018.  Do you know why there is such

7     a gap in reaching out for information regarding this

8     issue?

9                    MR. ROBINSON:  Objection.  To the extent

10    the question asks for attorney-client communications, I'm

11    advising the witness not to answer.  If you can answer

12    without divulging attorney-client communications, you can

13    do so.

14                    THE WITNESS:  I abstain.

15    BY MR. BUZZETTA:

16         Q.   You don't know any reason why there was a

17    three-year gap in contacting Ocwen regarding this

18    dispute?

19                    MR. ROBINSON:  Objection.

20                    THE WITNESS:  No.

21    BY MR. BUZZETTA:

22         Q.   Do you know what the term "statute of

23    limitations" means?

24                    MR. ROBINSON:  Objection.

DEAN F. ZINETTI

Page 180

```
 1                    THE WITNESS:  This is written and sent.
 2       This was sent from -- signed legal counsel at the time
 3       from Legal Services and replied directly to her.  There's
 4       no CC on here that we -- was sent a copy of it, and I
 5       have no knowledge of seeing this before.  The spreadsheet
 6       that's provided on here isn't even a spreadsheet.  It's a
 7       date and two numbers with no indication of what each
 8       number means for which column, and amounts at the bottom
 9       which don't add up to the other numbers on the first
10       sheet.
11                    So I don't even know, you know -- I
12       can't make sense of this response.  Again, it looks like
13       a half done -- I mean, again, this still isn't even
14       anywhere -- let's see.  Committed to relationship on --
15       yeah, it's more than I can differentiate because I don't
16       know what any of these numbers mean.  There's no
17       indication of them.
18       BY MR. BUZZETTA:
19            Q.   If I could draw your attention to page 1, the
20       very bottom identifies those documents, month, P&I,
21       principal, interest, and escrow.  Does that help your
22       analysis of this document?
23            A.   Okay.  So principal, interest -- I mean,
24       that's what the breakdown has as the columns, but, again,
```

DEAN F. ZINETTI

Page 181

1    the numbers don't match up.

2         Q.   When you say "the numbers don't match up,"

3    I've got a calculator handy, and I just want to check

4    this here.  I'm happy if you want to pull something out

5    to use as well.  But if you have --

6                   MR. ROBINSON:  We don't have a

7    calculator.

8                   MR. BUZZETTA:  Fine.  Then I'll

9    represent for the record, if you add together principal

10   payments and interest of $10,964.32 and $29,210.03, you

11   get a total of $40,174.35.  Is that not the identical

12   amount that is provided and broken down in the response?

13                  MR. ROBINSON:  Objection.  Statements of

14   counsel are not evidence.

15                  MR. BUZZETTA:  Well, I'm happy for him

16   to get out a piece of paper and a pencil and do the math

17   if he wants.

18                  MR. ROBINSON:  I'll give him a piece of

19   paper and a pencil and wait for him to do the math, then.

20   For the record, I gave him a pen and one piece of white

21   paper.

22                  THE WITNESS:  Okay.  The numbers --

23   after calculating, the numbers match.

24   BY MR. BUZZETTA:

DEAN F. ZINETTI

                                                     Page 182

1        Q.   So my question then is, is the response not

2    providing the breakdown that was requested in the other

3    letter?

4                    MR. ROBINSON:  Objection.

5                    THE WITNESS:  It looks to appear that a

6    breakdown was done that matches the description of

7    payments of what's on the request.

8    BY MR. BUZZETTA:

9        Q.   Okay.  And, also, I note that the letters

10   state that these are for a reinstatement amount in June

11   of 2018.  Just to be clear, you were offered the ability

12   to reinstate at $48,000 -- well, it looks like

13   $47,408.02, but you declined to do so; is that correct?

14       A.   I do not recall being given this information.

15   As I said, the letter from Ocwen was addressed to, and

16   looks like possibly even emailed to Ms. Gauthier directly

17   because we are not cc'd on this.

18       Q.   Ms. Gauthier was requesting a reinstatement on

19   your behalf, though.  Is that not correct?

20       A.   That's what it says in her letter, yes.

21       Q.   Okay.  But you don't recall whether you were

22   informed that you could reinstate for this amount in June

23   of 2018?

24       A.   No, I do not.