Page 1

```
 1                          - - -
 2         IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE
 3
                            - - -
 4
       DEAN ZINETTI and ANGELA K.:
 5     ZINETTI,                    :  CIVIL ACTION
              Plaintiffs,          :
 6                                 :
              vs.                  :
 7                                 :
       DEUTSCHE BANK, et al.,      :
 8                                 :
              Defendants.          :  NO. 1:19-CV-01279-LPS
 9
                            - - -
10
                TUESDAY, AUGUST 31, 2021
11
                            - - -
12         Zoom deposition of ANGELA K. ZINETTI taken
13     at 5 VINING LANE, Wilmington, Delaware, commencing
14     at 10:00 a.m., before John P. Donnelly, a Registered
15     Professional Reporter, and Notary Public in and for
16     the Commonwealth of Pennsylvania and the State of
17     Delaware.
18
                            - - -
19
                 VERITEXT LEGAL SOLUTIONS
20             Registered Professional Reporters
21              300 Delaware Avenue, Suite 815
                    Wilmington, DE 19801
22                     (302)571-0510
23
24
```

# EXHIBIT 3

ANGELA K. ZINETTI

Page 5

1      COURT REPORTER: The attorneys
2  participating in this deposition acknowledge that I
3  am not physically present in the deposition room,
4  and that I will be reporting this deposition
5  remotely.
6      They further acknowledge that in lieu
7  of an oath administered in person, I will administer
8  the oath remotely.
9      The parties and their counsel further
10 agree that the witness may be in a state where I am
11 not a Notary and stipulate to the witness being
12 sworn in by an out-of-state Notary.
13     If any party does have an objection
14 to this manner of reporting, please state so now.
15     (No response.)
16     COURT REPORTER: Hearing none, we can
17 proceed.
18     ANGELA K. ZINETTI, having been duly
19 sworn or affirmed, testified as follows:
20     EXAMINATION
21 BY MR. BUZZETTA:
22     Q.   Good morning, Mrs. Zinetti.  Have you
23 ever been deposed before?
24     A.   In regards to this case no, basically

```
 1    this specific one.  I signed and initialed a lot of
 2    documents that day.
 3           Q.    Do you recall that you needed to sign
 4    and initial documents in order to complete the loan
 5    transaction?
 6           A.    Right.  We were told to sign these
 7    documents for the loan, and that is what we did.
 8           Q.    Do you recall whether you read the
 9    documents before you signed them that day?
10           A.    I do not recall.
11           Q.    Just looking at this document, do you
12    recall whether you ever read this document?
13           A.    I do not recall.
14           Q.    Did you understand when you took out
15    your loan that you were going to be required to make
16    monthly payments?
17           A.    Yes.
18           Q.    Did you understand that the lender
19    could charge a late fee for any less than full
20    payment received?
21           A.    Yes.
22           Q.    Did you understand that the loan you
23    were originating had an adjustable interest rate?
24           A.    Yes.
```

ANGELA K. ZINETTI

Page 46

1   Q.  And in your mind, what is an
2   adjustable interest rate?
3   A.  Adjustable rate is one that changes.
4   Q.  That it can change at set times for
5   certain percent amounts?
6   A.  Yes.
7   Q.  As opposed to a fixed rate loan where
8   the interest rate is the same every month for the
9   entire duration of the instrument.  Correct?
10  A.  Correct.
11  Q.  Did you understand that the lender
12  had the right to take certain actions if you failed
13  to make monthly payments under your note?
14  A.  One more time, please.
15  Q.  I thank you again for asking me to
16  clarify if you don't understand.  Did you understand
17  when you took out your loan that the lender had the
18  right to take certain action if you failed to make
19  your monthly payments?
20  A.  I understand that to be anything
21  about a loan.
22  Q.  That is no different than any other
23  loan, there are consequences if you fail to make
24  your monthly payments?

ANGELA K. ZINETTI

Page 47

1       A.    Right.  I am agreeing to pay the
2 money.  You are agreeing to accept it.
3       Q.    If you fail to make that payment, the
4 lender can take action.  Correct?
5       A.    Yes.
6       Q.    Just directing you to page one of the
7 document, "Interest."  Do you recall paragraph two
8 that the original interest rate on your loan was
9 7.9 percent?
10      A.    That sounds correct.  That sounds
11 familiar.  So I would think so.
12      Q.    Well, looking at paragraph one, do
13 you recall that your original loan amount, the
14 principal was $264,735?
15      A.    That sounds about right.
16      Q.    The original lender was Saxon?
17      A.    Yes.
18      Q.    Sorry, Saxon Mortgage, Incorporated?
19      A.    Yes.
20      Q.    Do you recall the reasons -- if a
21 reason was ever given to you as to why the interest
22 rate was 7.9 percent?
23      A.    No, I don't recall that.
24      Q.    In your mind, do you recall whether

```
 1            A.      I do not recall.
 2            Q.      Do you recall whether you've read
 3    this document since that time.
 4            A.      I do not recall.
 5            Q.      You have been in a dispute with your
 6    mortgage lender for a very long time now, a number
 7    of years.  Do you recall at any point going back and
 8    reading the mortgage as part of that dispute?
 9            A.      Not that I can recall.
10            Q.      You understood when you took out the
11    loan that you were required to make monthly payments
12    on your mortgage?
13            A.      That's correct.
14            Q.      Did you understand that those monthly
15    payments included both interest and principal on the
16    loan?
17            A.      Yes.
18            Q.      Did you understand that the lender
19    could also require escrow as part of your monthly
20    payments for your loan?
21            A.      Sorry, repeat the question.
22            Q.      Did you understand that in addition
23    to principal and interest, your lender could charge
24    for escrow as part of your monthly mortgage
```

ANGELA K. ZINETTI

Page 53

```
 1       payments?
 2              A.    That they could, yes.
 3              Q.    Do you recall whether an escrow was
 4       initially charged on your loan?
 5              A.    No, there wasn't.
 6              Q.    But do you recall when that changed?
 7              A.    When we go into the HAMP program, it
 8       was required.
 9              Q.    Do you recall when you got into the
10       HAMP program?
11              A.    When we got into the HAMP program?
12       We submitted the initial paperwork in, roughly,
13       around March 2009.  But it didn't actually get going
14       until mid to late 2009 because they lost the
15       paperwork three times.
16              Q.    Who was servicing the loan at the
17       time?
18              A.    Saxon.
19              Q.    Do you know what escrow was collected
20       for?
21              A.    Insurance and taxes.
22              Q.    Insurance on the property.  Correct?
23              A.    Correct.
24              Q.    Taxes for the property?
```

ANGELA K. ZINETTI

Page 95

1  regarding the outcome of that litigation since it
2  was settled?
3       A.    Not that I know of.
4       Q.    But to the best of your recollection,
5  no more than 90 days after the prior settlement, you
6  believed that Ocwen had not fixed credit reporting
7  concerning you and your husband. And as a result,
8  you retained new legal counsel?
9       A.    That sounds about right.
10      Q.    Do you believe you retained Legal
11 Services of Delaware in 2013?
12      A.    I don't know the dates. I would have
13 to look at my e-mails.
14      Q.    I will just state for the record, the
15 settlement agreement was signed by Ocwen in March of
16 2013, if that helps jog your recollection at all as
17 to when you may have retained Legal Services of
18 Delaware.
19      A.    No, I still have to check my e-mails.
20      Q.    I want to be -- I am not asking for
21 any communications with counsel. But what in your
22 e-mails would jog would refresh your recollection?
23      A.    The dates.
24      Q.    What specific e-mails would there be?

ANGELA K. ZINETTI

Page 98

1   settlement -- let me ask a different question.
2            Do you recall when you came to first
3   believe, after the settlement, that Ocwen still had
4   incorrect accounts?
5       A.   No, I don't recall when.  Probably
6   would be around the same time that we realized the
7   credit reports weren't being fixed.
8       Q.   Were you getting monthly statements
9   immediately after the settlement agreement?
10      A.   I don't know.  I would have to check
11  my records.
12      Q.   Do you have any recollection as to
13  how you came to believe that the accounts were
14  incorrect after the settlement agreement was
15  executed?
16      A.   When did you say it was executed,
17  2013?
18      Q.   March 2013.
19      A.   Your question about statements, I did
20  believe we did get statements after that.
21      Q.   Okay.  And do you believe it was
22  review of those statements that prompted your
23  concern?
24      A.   Yes.

1      Q.    So you believe it would have maybe --
2  would have been within the first two or three
3  statements you were concerned, you had that concern?
4      A.    Yes, I try to give the company the
5  benefit of the doubt to catch it on documents and
6  things that worked their way through the system, but
7  within two to three months, if you are not fixing
8  what you are supposed to, then you are not doing
9  what you are supposed to.
10     Q.    So no later than 90 days after the
11 settlement agreement was executed, you believe that
12 Ocwen was not in compliance with the agreement?
13     A.    With the settlement agreement,
14 correct.
15     Q.    When you used the term "not doing
16 what they agreed to" earlier, is there something
17 else that you believed that Ocwen had not
18 implemented regarding the settlement other than the
19 credit reporting or the account balances?
20     A.    Off the top of my head, there were
21 four bulleted points, and I am pretty sure three of
22 them were not completed, what they signed and agreed
23 to.
24     Q.    Without reviewing the settlement

1   was e-mailed to me.
2           Q.   Did you review it after you began
3   having concerns that Ocwen had not implemented it?
4           A.   Yes.
5           Q.   Do you have any knowledge regarding
6   the negotiations that led to this settlement
7   agreement?
8           A.   Can you rephrase the question?
9           Q.   Do you have any knowledge regarding
10  any prior versions of this settlement agreement?
11          A.   Not that I can recall.
12          Q.   Do you have any knowledge regarding
13  any proposed different terms to this settlement
14  agreement?
15          A.   Not that I can recall.
16          Q.   You understood when this settlement
17  agreement was signed that this agreement would
18  obligate the parties to take whatever actions
19  specified therein as a result of settling the
20  litigation.  Is that correct?
21          A.   That's correct.
22          Q.   What did you understand an account
23  reconciliation to be?
24          A.   That Ocwen would go back to the

1   beginning of our account, look at all the payments
2   we have made, when it was supposed to be due, the
3   escrow and insurance -- escrow was supposed to be
4   starting when the HAMP was signed into play and
5   figure out everything that should have been done if,
6   hypothetically, the payments had been received on
7   time the way it was supposed to be.  Because it says
8   that we wouldn't be held liable for any incurred --
9   or what is the word -- fees or anything like that
10  that was tacked on prior to settlement.  Everything
11  should have been cleared out and straightened out.
12  And it wasn't.
13          Q.    When you say it wasn't done, how have
14  you come to that belief?
15          A.    Because we have -- not sure where we
16  got them from -- printouts of all the transactions
17  attached to our account and they don't make sense.
18          Q.    Are you referencing the payment
19  histories previously supplied to you by Ocwen?
20          A.    I'm not sure what they are called.
21  If I see them, I'd know them.
22          Q.    But these are spreadsheets, or these
23  are documents that have a ledger of transactions and
24  your response -- they do not make sense to you?

1      account?
2             A.    Can I refresh in the document?
3             Q.    Absolutely.
4             A.    Could you repeat the question?
5             MR. BUZZETTA:  Court reporter, do you
6      mind.
7             (The reporter read back as
8      requested.)
9             THE WITNESS:  A specific balance, no.
10     But they were supposed to do a reconciliation on it.
11     BY MR. BUZZETTA:
12            Q.    So your understanding of the
13     settlement agreement obligated them to do a
14     reconciliation, but it did not specify a required
15     outcome of that reconciliation?
16            A.    Not that I recall, no.
17            Q.    Do you believe Ocwen has complied
18     with the obligations concerning your credit
19     reporting as of today?
20            A.    No.  That's why that is part of the
21     litigation.
22            Q.    It's your belief that Ocwen has not
23     made any changes that were required to your credit
24     reporting under the settlement agreement?

1   Practices Act, what familiarity do you have with
2   that?
3       A.   I have heard the title, but I am not
4   familiar with it.
5       Q.   Did you have any knowledge of the
6   Fair Debt Collection Practices Act before this suit?
7       A.   Not that I can recall.
8       Q.   Do you have any personal knowledge
9   concerning whether or not Ocwen violated RESPA in
10  handling your account?
11      A.   That's what I'm relying on my lawyers
12  for.  I am not familiar with it.
13      Q.   Do you have any personal knowledge as
14  to how Ocwen violated the Fair Debt Collection
15  Practices Act concerning your account?
16      A.   Again, I'm relying on my lawyers for
17  that.  That's probably in our interrogatories.
18      Q.   Do you have any personal knowledge
19  ass to whether Ocwen is a debt collector?
20      A.   That is a yes.
21      Q.   What knowledge do you have that Ocwen
22  is a debt collector?
23      A.   The fact it says so on their
24  statements.

1    Q.    On monthly statements?
2    A.    On the statements that we did
3    receive, yes.
4    Q.    Do you have any other knowledge,
5    aside from those statements, as to whether or not
6    Ocwen is a debt collector?
7    A.    It's possible they say it at the
8    beginning of the phone conversations because I do
9    remember hearing that when I spoke with them on the
10   phone way back when.
11   Q.    Prior to when you were represented by
12   counsel?
13   A.    I don't know when the phone calls
14   were, but I do remember hearing that repeatedly.
15   Q.    Any other knowledge or evidence that
16   you have whether or not Ocwen is a debt collector?
17   A.    Not that I can recall.
18   Q.    Do you recall a time when Ocwen
19   returned any of your monthly mortgage payments?
20   A.    Yes.
21   Q.    When do you recall that and how many?
22   A.    July and August of 2015.
23   Q.    Had Ocwen ever returned any payments
24   prior to July and August of 2015?

1        A.     Okay.
2        Q.     The column on the left are dates of
3   letters sent by Legal Services of Delaware.  And the
4   column on the right are responses from Ocwen.  Just
5   looking here, I can see that the first three letters
6   are dated in 2014, and 2015.  There are no letters
7   again until 2018.  Do you have any knowledge as to
8   why there were no communications from your counsel
9   regarding this dispute between October 28, 2015, and
10  April 4, 2018?
11       A.     No, I don't have any knowledge of
12  that.
13       Q.     Do you recall approximately when
14  Susan Flood was representing you?
15       A.     I don't know the date she stopped.
16  So I don't know.  I don't recall the dates.
17       Q.     And of the seven letters, the first
18  three are from Susan Flood.  The last four are from
19  Frances Gauthier.  Are you aware of any
20  communication from the gentleman who was counsel in
21  between them with Ocwen?
22       A.     No.
23       Q.     Do you know how long that individual
24  was your counsel?

1   Is that correct?
2       A.   Correct.
3       Q.   You never contacted Ocwen to request
4   modification or reinstatement?
5       A.   That is correct.
6       Q.   You have not offered a payment to
7   Ocwen since 2015?
8       A.   Not since they rejected our payments.
9   No.
10          MR. BUZZETTA:  We are going to go to
11  tab 16.  I'm going to mark this and introduce this
12  as Exhibit 15.  This is a document entitled
13  "Plaintiffs' Supplemental Responses to Defendants'
14  First Set of Interrogatories."  It is 27 pages long.
15              - - -
16          (Whereupon a document was marked for
17  identification purposes Exhibit 15.)
18              - - -
19  BY MR. BUZZETTA:
20      Q.   Flip to page 26, just to confirm
21  that's your signature above the signature line?
22      A.   It is.
23      Q.   And that you verified that the
24  content of the foregoing was true under the

1   that Ocwen would pull their act together and do what
2   they were supposed to do.
3          Q.    Have you made any payments on your
4   property taxes since 2015?
5          A.    We have money set aside in the escrow
6   along with the principal and interest payment.
7          Q.    Have you made any payments for your
8   homeowner's insurance since 2015?
9          A.    No.  Again, but I put the money aside
10  with principal and interest payments and the escrow.
11         Q.    Any payments to Ocwen since 2015?
12         A.    No.
13         Q.    Confirm not having any payments to
14  Ocwen, you have not made any payments to Ocwen for
15  principal, interest, taxes or homeowner's insurance
16  since 2015?
17         A.    I haven't paid them because they kept
18  returning them.  What's the point of making them
19  when they are just going to send them back?
20         Q.    I'm asking you to confirm you have
21  not made any payments to Ocwen for principal,
22  interest, taxes, or homeowner's insurance since
23  2015?
24         A.    No.