## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DEAN ZINETTI and ANGELA K. ZINETTI, §<br>§<br>*Plaintiffs*, §<br>§<br>v. §<br>§<br>DEUTSCHE BANK NATIONAL TRUST §<br>COMPANY ET AL., §<br>§<br>*Defendants*. §<br>§ | Civil Action No. 19-1279-WCB |

## <u>MEMORANDUM OPINION AND ORDER</u>

The plaintiffs (collectively, "the Zinettis") and the defendants have each filed motions for summary judgment on various issues in this case.  Dkt. Nos. 87, 90.  The defendants have also filed a motion to exclude expert testimony under *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Dkt. No. 88.  On July 29, 2022, I held oral argument on those motions.  This order contains my disposition of each of those motions.[1]

### I.      <u>Background</u>

In 2019, the Zinettis brought this action against defendants Deutsche Bank National Trust Company ("Deutsche Bank") and Ocwen Loan Servicing, LLC, ("Ocwen") in Delaware state court.  The defendants subsequently removed the action to federal court based on the federal claims asserted in the complaint.  Dkt. No. 1.

---

[1]  Following the briefing on the defendants' motion for summary judgment, the Zinettis objected to two arguments that they allege were raised for the first time in the defendants' reply brief.  Dkt. No. 102.  Because those arguments do not factor into my analysis of the defendants' motion, the plaintiffs' objections are overruled.

In their complaint, the Zinettis alleged violations of the federal Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*, and the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, along with breach of contract and several other state law claims.  Magistrate Judge Hall recommended that several of the Zinettis' claims be dismissed under Federal Rule of Civil Procedure 12(b)(6), Dkt. No. 25, and Judge Stark adopted her recommendation. Dkt. No. 29.  The claims that remain in the lawsuit are the RESPA and FDCPA claims against Ocwen and a breach of contract claim against Deutsche Bank.

The underlying facts are somewhat complex.  In 2007, the Zinettis obtained a home mortgage loan from Saxon Mortgage, Inc. ("Saxon").  Saxon initially serviced the loan and collected only the principal and interest due on the loan.  In 2010, the Zinettis entered into a loan modification as part of the Home Affordable Modification Program ("HAMP").  The new arrangement modified the Zinettis' principal and interest payments, and it also established an escrow account for the payment of property taxes and insurance premiums.  The HAMP modification provided that $799.62 from each monthly payment would be allocated to the principal and interest due on the loan, and the remainder of the payment would be allocated to escrow.  Periodically, the mortgage servicer would conduct an escrow analysis to determine how much money needed to be paid into the escrow account each month.  That amount, added to the $799.62 principal and interest payment, became the "target" monthly payment amount.

Once the HAMP modification took effect, the Zinettis began making monthly payments that included amounts for principal, interest, and escrow.  In February and March 2010, the Zinettis made monthly payments in the amount of $1,525.35.  From April 2010 to January 2011, the Zinettis made monthly payments in the amount of $1,142.77.  And from February 2011 through June 2011, the Zinettis made monthly payments in the amount of $935.22.  The Zinettis attempted

to make payments in July and August 2011, but those payments were returned to the Zinettis and never credited to their mortgage account.[2]  The Zinettis never re-submitted those two payments.

In May 2011, Saxon reversed each of the payments that the Zinettis had made on the mortgage since February 2010 and applied the funds from those payments to the Zinettis' suspense account, apparently to correct an error in the allocation of those payments to principal and interest. Dkt. No. 90-3 at 6 (rows 87–103); *see also* Dkt. No. 105 at 2.  On May 17, 2011, before any of the Zinettis' payments were re-applied to their account, Saxon transferred the mortgage to Ocwen. After Ocwen began servicing the mortgage, it attempted to re-apply the funds that Saxon had placed into the Zinettis' suspense account to principal, interest, and escrow.  Dkt. No. 90-3 at 6 (rows 105–113).  However, Ocwen later realized that it had not properly re-applied the funds. Ocwen therefore reversed and re-applied the Zinettis' payments two additional times in September 2011.  *Id.* at 7–8 (rows 125–198); *see also* Dkt. No. 105 at 2.

On September 2, 2011, Ocwen re-applied the Zinettis' earlier payments to principal, interest, and escrow for the final time.  Dkt. No. 90-3 at 8 (rows 178–198).  That re-application of payments applied $799.62 to principal and interest for each month in the period of February 2010 through October 2011.  Once all the payments had been re-applied, Ocwen determined that the Zinettis had an escrow deficiency of $3,106.70.[3]  Ocwen conducted an escrow analysis and

---

[2]  During July and August 2011, the Zinettis' account appeared to be several months delinquent, and therefore in default, because the funds from some of their prior payments were held in their suspense account, as discussed in further detail below.  Because those payments had not been allocated to principal, interest, and escrow, it appeared as though the Zinettis were several payments behind on their mortgage, even though they had made all required payments up to that point.  Nevertheless, seeing the apparent default on the Zinettis' account, Ocwen returned the Zinettis' July and August 2011 payments to them.  *See* Dkt. No. 91 at 7.

[3]  The Zinettis note that prior to Saxon's initial reversal of their mortgage payments, their account had a positive escrow balance of $348.82.  The discrepancy between that balance and the escrow deficiency in September 2011 is attributable to two factors:  First, even though the Zinettis did not make payments for July and August 2011, Ocwen's final re-application of payments to the

increased the Zinettis' monthly target payment to $995.22 to account for that deficiency.  *Id.* (row 202).

From that point forward, the Zinettis continued to make monthly payments on their mortgage account, but those payments fell short of the target payment amounts set by Ocwen.  For example, the Zinettis made monthly payments of $935.22 between November 2011 and August 2012, each of which was $60.00 short of the target payment.  In August 2012, Ocwen increased the target payment to $1,010.90, but the Zinettis continued to make monthly payments in the amount of $935.22.

Seeking to resolve what they describe as "accounting disputes" with Ocwen, the Zinettis filed a lawsuit against Ocwen in 2012.  Dkt. No. 106-1 at 6.  The Zinettis, Ocwen, and Deutsche Bank resolved that dispute by entering into a settlement agreement that took effect on March 6, 2013.  The settlement agreement provided, among other things, that (1) Ocwen would perform an "accurate reconciliation of the [Zinettis'] escrow account"; (2) "[a]ny charges that were assessed [to the Zinettis] by reason of a claimed delinquency in payment shall be removed from the [mortgage] statement"; and (3) Ocwen would "update [its] credit reporting to state that the [Zinettis were] not in default on the Loan from May 2011" through March 6, 2013.  Dkt. No. 87-3 at Apx250–51.  The agreement further provided that the Zinettis released any additional claims that they had against Ocwen and Deutsche Bank at that time.  *Id.* at Apx252–53.

---

Zinettis' account credited them for principal and interest payments for those two months.  Second, throughout its management of the Zinettis' mortgage account, Saxon first underestimated and then overestimated the amount of escrow that was due and, as a result, disbursed approximately $2,000 from the Zinettis' escrow account back to the Zinettis in December 2010.  *See* Dkt. No. 90-3 at 5 (row 75); *see also* Dkt. No. 91 at 5–6.  That disbursement included funds that would have been paid by the Zinettis into their escrow account during the period of February through December 2010.  *See* Dkt. No. 90-3 at 5 (rows 57–75).  Ultimately, in view of the record evidence, it is clear that the Zinettis' account was credited with the full amounts paid by the Zinettis during the period of February 2010 through June 2011.

On March 6, 2013, Ocwen completed the escrow analysis required by the settlement agreement and determined that the Zinettis' monthly payment should be $1,006.90. The Zinettis, however, continued to pay only $935.22 each month until May 2014, at which point they began making monthly payments in the amount of $1,000.00. Then, in September 2014, Ocwen conducted another escrow analysis and determined that the Zinettis' target monthly payment should be $1,138.45. In January 2015, the Zinettis increased their monthly payment amount to $1,100.00, but that amount continued to fall short of the target payment amount. In July 2015, the Zinettis' account went into default, and Ocwen began returning payments to the Zinettis. Ultimately, between February 2010 and July 2015, the Zinettis paid a total of approximately $4,600 less on their mortgage than Ocwen's target payments would have required them to pay.[4]

## II.    Legal Standard

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the case of an issue on which the nonmoving party bears the burden of proof at trial, the party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c) as of 1986). The burden on the nonmoving party in that situation can be satisfied by "showing," that is, by "pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the

---

[4] A comparison of the Zinettis' target payments, as calculated by Ocwen, compared to the amounts actually paid is included as an appendix to this order.

moving party carries its burden, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up).

### III.   Defendants' Motion for Summary Judgment

I begin by addressing the defendants' motion for summary judgment.  In their motion, the defendants allege that (1) the Zinettis' breach of contract claim fails because Ocwen did not bill them for an improper amount and because the claim is time-barred; (2) the Zinettis' FDCPA claims fail because Ocwen is not a debt collector and did not engage in improper debt collection activity, and because one of the claims is time-barred; and (3) the Zinettis' RESPA claim fails because Ocwen conducted a reasonable investigation of the Zinettis' claim that Ocwen's charges were unjustified.

### A.  Breach of Contract

The Zinettis' breach of contract claim alleges that Deutsche Bank breached the mortgage agreement (as modified under HAMP) by allowing Ocwen to improperly bill the Zinettis for the escrow amount due each month.  The defendants argue that Ocwen properly billed the Zinettis throughout the relevant time period and that the claim is time-barred.  For the reasons set forth below, the defendants' motion is GRANTED with respect to the Zinettis' breach of contract claim.

A core assertion underlying the Zinettis' breach of contract claim is that the mortgage loan was "current" at the time the 2013 settlement agreement was executed.  In the Zinettis' view, the loan being "current" would mean that there were no delinquent payments or escrow deficiencies as of the time the settlement agreement was executed, i.e., there were no amounts due and owing on the mortgage as of the date of the settlement agreement.

6

That assertion, however, is not supported by the language of the settlement agreement. The settlement agreement provided two primary mechanisms by which the alleged errors in the accounting on the Zinettis' account would be corrected. First, the agreement required Ocwen to perform an "accurate reconciliation of the escrow account." Dkt. No. 87-3 at Apx250. The agreement, however, did not contain any requirement or guarantee regarding the result of that reconciliation other than that it be accurate. *See id.* Second, the agreement required Ocwen to remove "[a]ny charges that were assessed [against the Zinettis] by reason of a claimed delinquency in payment." *Id.* That is, Ocwen agreed not to assess any past delinquency charges (e.g., late fees) against the Zinettis.[5] In view of those two provisions, the settlement agreement continued to require that the Zinettis pay amounts that were "due and owing" under the mortgage as modified under HAMP. *Id.*

The Zinettis argue that two provisions of the settlement agreement support their argument that their mortgage account was current as of the date of the settlement agreement. First, they point to the language of the agreement providing that Ocwen must "update [its] credit reporting to state that the [Zinettis were] not in default on the Loan from May 2011" through March 6, 2013. *See id.* at Apx251. That provision, however, does not address the Zinettis' payment obligations to Ocwen. It merely provides that Ocwen must communicate to the credit reporting agencies that the Zinettis' account was not in default during the period of May 2011 to March 2013.

---

[5] At the oral argument, counsel for the Zinettis suggested that this second mechanism also applied to amounts that were due but not paid prior to execution of the settlement agreement. That reading of the settlement agreement is unpersuasive, however, given that the only charges that Ocwen agreed not to assess were those assessed "by reason of a claimed delinquency in payment," such as late charges. Dkt. No. 87-3 at Apx250. Charges to principal, interest, and escrow were assessed not because of a claimed payment delinquency, but because the mortgage required the Zinettis to make those payments each month.

Second, the Zinettis point to Paragraph 8 of the settlement agreement, which is titled "Release of Unknown Claims." *Id.* at Apx253. That section relates to "the releases set forth herein," i.e., the releases contained in the settlement agreement, and it notes that such releases extend to causes of action that "may provide that a general release does not extend to claims which are not known to exist at the time of execution." *Id.* The only express release in the settlement agreement is a release by the Zinettis of all their claims against Ocwen. *See id.* at Apx252–53. There is no express release by Ocwen of any claims it may have had against the Zinettis, including the right to collect amounts that were due and owing as of the date of the agreement.

Simply put, the language of the settlement agreement provides no basis to conclude that Ocwen and Deutsche Bank intended to forfeit the right to collect amounts that were due on the mortgage but had not previously been paid by the Zinettis.

As required by the settlement agreement, Ocwen conducted a reconciliation of the account and calculated that the Zinettis' account had an escrow deficiency of $3,294.27. Moreover, the account was two payments behind at the time of the settlement agreement due to the Zinettis' failure to pay the full target payment amount each month, beginning in November 2011.[6]  As

---

[6]  The Zinettis' mortgage agreement allows the mortgage servicer to accept a partial payment (i.e., a payment for less than the target amount) without applying those funds to the Zinettis' principal, interest, and escrow balances. Dkt. No. 87-3 at Apx87. The servicer may then "hold such unapplied funds until [the Zinettis] make payment to bring the Loan current." *Id.* That means that when the Zinettis made a payment that was short of the target payment in a given month, Ocwen withdrew the difference between the amount paid and the target payment from the Zinettis' unclaimed funds balance (which Ocwen refers to as a "suspense" account) to credit the Zinettis with a full payment as of that month. *See, e.g.*, Dkt. No. 90-3 at 9 (row 226; withdrawing $75.68 from the suspense account for the difference between the $935.22 payment made and the target payment of $1,010.90). When the balance of the suspense account was insufficient to account for the difference in a particular month, Ocwen applied the next partial payment to the suspense account rather than to principal, interest, and escrow. *See, e.g.*, *id.* (row 235). That payment was then effectively treated as a missed payment, because that month's payment was not applied to principal, interest, and escrow, and remained in the unapplied funds balance. The mortgage agreement confirms that this practice was proper. Moreover, that practice is not unique

noted, the settlement agreement did not provide that the mortgage was "current," as alleged by the Zinettis, and therefore Ocwen was not required to forgive either of those two deficiencies.

The Zinettis' allegations amount to the contention that Ocwen billed the Zinettis for amounts that were not due and owing, and therefore Deutsche Bank was in breach of the mortgage agreement by allowing Ocwen to bill for amounts not due.  Such a breach, if it occurred, would have to be due to one of two possibilities: (1) the reconciliation that Ocwen conducted as required by the settlement agreement was not accurate; or (2) some error that post-dated the reconciliation resulted in improper amounts being charged to the Zinettis.

Regarding the first possibility, the Zinettis have not provided a sufficient basis to believe that the escrow analysis conducted pursuant to the March 6, 2013, settlement agreement was inaccurate.  As noted above, the Zinettis received full credit for the payments made during the period from February 2010 through June 2011, and their failure to pay the full target payment amount each month beginning in November 2011 is the cause of their account's apparent delinquency as of the time of the settlement agreement.  Beyond those two items, the Zinettis have failed to identify any specific issue with the March 2013 escrow analysis that would have rendered it inaccurate. [7]

---

to the Zinettis' mortgage account.  *See, e.g.*, *Florez v. Freedom Mortg. Corp.*, 776 F. App'x 185, 186 (4th Cir. 2019) (discussing a mortgage agreement under which the servicer was permitted to "hold payments in the [unclaimed funds account] until [the borrowers] tendered enough money to constitute a full periodic payment").

[7]  Any claim by the Zinettis of a breach of the settlement agreement would be time-barred.  Under Delaware law, the statute of limitations for a breach of contract claim is three years.  10 Del. Code § 8106(a); *Millett v. Truelink, Inc.*, No. 05-cv-599, 2006 WL 2583100, at *5 (D. Del. Sept. 7, 2006).  To the extent that the Zinettis allege that Ocwen breached the settlement agreement by failing to accurately reconcile their escrow account, the Zinettis would have been aware of that failure at the time the reconciliation was completed, in March 2013, and certainly by the time their loan went into default in 2015.  But this lawsuit was not filed until 2019, which is past the limitations period under either scenario.  Accordingly, the Zinettis are barred from asserting that

To the extent the Zinettis argue that Ocwen committed errors prior to March 6, 2013, that are nevertheless actionable under the mortgage (which is subject to a twenty-year limitations period), that argument is unpersuasive.  The focus of the Zinettis' allegations regarding billing errors is that Ocwen improperly calculated the amount of escrow that was due on the Zinettis' mortgage account each month, and therefore the Zinettis were billed for amounts that they did not actually owe.  The Zinettis, however, have failed to point to any specific error in the escrow analyses conducted by Ocwen, nor have they indicated what the escrow payment should have been for any given month.

The Zinettis' expert, Bernard Jay Patterson, alleges that there was an error in the escrow analysis that Ocwen conducted in September 2011.  *See* Dkt. No. 89-1 at 21.  His report and conclusions, however, are based on the flawed premise that the Zinettis received credit for the payments they submitted in July and August 2011, despite the fact that those payments were returned to them.  Dkt. No. 89-2 at 87:1–89:15, 118:19–119:8.  His ultimate opinion therefore assumed that the Zinettis paid $1,870.44 more than they actually paid during the time period he analyzed, and that assumption impacted all calculations relating to dates later than August 2011.  Mr. Patterson's opinions regarding errors committed by Ocwen in calculating the escrow amount due each month are therefore entitled to no weight.  Setting aside Mr. Patterson's analysis, the Zinettis have not offered any evidence to rebut Ocwen's showing that its calculations of the Zinettis' account balances in the reconciliation conducted pursuant to the settlement agreement were correct.

---

Ocwen breached the settlement agreement by failing to accurately reconcile the Zinettis' escrow account.

Regarding the second possibility, the Zinettis have not alleged any calculation error on the part of Ocwen that occurred after March 6, 2013.  Mr. Patterson's report focuses exclusively on errors that occurred in the application of payments to the Zinettis' account prior to March 6, 2013.  *See generally* Dkt. No. 89-1.  Moreover, the Zinettis have not pointed to any other evidence suggesting a calculation error that took place after March 6, 2013.  There is therefore no genuine dispute of material fact as to whether Ocwen erred after March 6, 2013, in a manner that resulted in the Zinettis being improperly billed.

Because the Zinettis have failed to allege a plausible claim for relief on their breach of contract claim, summary judgment is GRANTED to Deutsche Bank on that claim.

B.  Fair Debt Collection Practices Act

The Zinettis raise three claims against Ocwen under the FDPCA:  First, in Count III of their complaint, the Zinettis allege that Ocwen used unfair or unconscionable means to collect the payments owed on the Zinettis' mortgage, in violation of 15 U.S.C. § 1692f.  Second, in Count IV of their complaint, the Zinettis allege that Ocwen failed to cease collection of the mortgage debt after the Zinettis notified them that the debt was disputed, in violation of 15 U.S.C. § 1692g(b).  Third, in Count V of their complaint, the Zinettis allege that Ocwen has failed to notify credit reporting bureaus that the debt on the Zinettis' mortgage account is in dispute, in violation of 15 U.S.C. § 1692e(8).  In response, Ocwen argues that it is not a "debt collector," and therefore that the FDCPA does not apply to it.  Ocwen also contends that the Zinettis' claims under the FDCPA are time-barred.

1.  *"Debt Collector"*

In order for the Zinettis to prevail on their FDCPA claims, they must establish that Ocwen is a "debt collector" as defined in the FDCPA.  *See* 15 U.S.C. §§ 1692e(8), 1692f, 1692g(b) (all

applying to the conduct of "debt collector[s]"); *see also Tepper v. Amos Fin., LLC*, 898 F.3d 364, 365–66 (3d Cir. 2018).  A "debt collector" is defined by the FDCPA as "any person" who (1) "uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts" (often referred to as the "principal purpose" definition) or (2) "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another" (often referred to as the "regularly collects" definition).[8]   15 U.S.C. § 1692a(6); *Tepper*, 898 F.3d at 366.  An entity that would otherwise be covered by the definition of debt collector is exempt from the definition if it meets one of several exceptions, including if the debt collection activity at issue "concerns a debt which was not in default at the time it was obtained" by the entity.  15 U.S.C. § 1692a(6)(F)(iii).

The parties agree that Ocwen is a mortgage loan servicer.  *See* Dkt. No. 91 at 13; Dkt. No. 91-1 at 15 (plaintiffs admitting that "Ocwen is a service provider for mortgage companies"). Ocwen argues that it does not meet the "principal purpose" definition of debt collector because, as a mortgage servicer, Ocwen's "principal purpose and most important aim is to service mortgages on behalf of investors, not to collect debt."  Dkt. No. 91 at 14.  Ocwen also argues that the Zinettis have produced insufficient evidence that Ocwen meets the "regularly collects" definition of debt collector.  *Id.*

Earlier in this case, Ocwen moved to dismiss the FDCPA claims against it on the ground that Ocwen was not a debt collector under the FDCPA.  In recommending the denial of Ocwen's motion, Magistrate Judge Hall noted that the Zinettis "ha[d] not alleged facts plausibly suggesting

---

[8]  Although not relevant here, the definition of "debt collector" also covers "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests."  15 U.S.C. § 1292a(6).

that Ocwen is a debt collector under the 'principal purpose' definition," but held that "Ocwen may satisfy the 'regularly collects' definition."  Dkt. No. 25 at 13.

In support of its arguments, Ocwen points out that "[n]umerous courts have concluded [that] mortgage servicing companies are generally not debt collectors under the FDCPA."  *Id.* Ocwen is correct that the FDCPA generally does not apply to mortgage loan servicers, but the reason is that the term "debt collector" does not apply to activity that "concerns a debt which was not in default at the time it was obtained."  *See* 15 U.S.C. § 1692a(6)(F)(iii); *Ayres v. Ocwen Loan Servicing, LLC*, 129 F. Supp. 3d 249, 277 (D. Md. 2015).  Accordingly, "mortgage servicing companies are exempt from the definition of 'debt collectors' under the FDCPA only to the extent that they take action to collect debts that were not in default at the time they acquired the debts."  *Ayres*, 129 F. Supp. 3d at 277 (cleaned up); *see also Carson v. Ocwen Loan Servicing, LLC*, 365 F. Supp. 3d 1163, 1171 (D. Colo. 2019); *Dias v. Fed. Nat'l Mortg. Ass'n*, 990 F. Supp. 2d 1042, 1053 (D. Haw. 2013).

In his deposition, Kevin Flannigan, an employee of Ocwen, admitted that the Zinettis' loan was in default (or at least appeared to be in default) when Ocwen became the servicer of the loan. Dkt. No. 87-3 at Apx125.  It would therefore be improper to conclude that Ocwen is excluded from the definition of "debt collector" solely on the basis that Ocwen is a mortgage servicer or that it falls outside the category of debt collectors on the ground that the debt collection activity at issue concerned a debt that was not in default at the time it was obtained.[9]  For purposes of the Zinettis'

---

[9]  Ocwen argues that the only evidence presented by the Zinettis that Ocwen is a debt collector is a notice that was included with some of Ocwen's mortgage statements.  *See* Dkt. No. 91-1 at 15.  That notice recited: "Important Notice:  This communication is from a debt collector attempting to collect a debt, any information obtained will be used for that purpose."  *Id.*  Ocwen cites several cases for the proposition that a debt collection notice by itself is insufficient to confer debt collector status on an entity, but those cases stand simply for the proposition that an entity that acquires a debt that was not in default (and is therefore excepted from the definition under

FDCPA arguments, I will therefore assume, without deciding, that Ocwen is a "debt collector," as that term is used in the statute.

### 2. Count III

The Zinettis' first FDCPA claim, set forth in Count III of their complaint, alleges that Ocwen used unfair or unconscionable means to collect the payments owed on the Zinettis' mortgage account, in violation of 15 U.S.C. § 1962f.  The Zinettis allege that the unconscionable conduct that Ocwen engaged in was "attempt[ing] to collect sums not owed from a mortgage borrower."  Dkt. No. 87-1 at 18.  That claim is based on the same allegation as the Zinettis' breach of contract claim: that Ocwen erred in calculating the escrow payment due on the Zinettis' account and therefore Ocwen was not entitled to collect those amounts.  As noted, the Zinettis have not pointed to any error in Ocwen's calculations that entitles them to relief.  Accordingly, summary judgment will be GRANTED to Ocwen on Count III.

### 3. Count IV

The Zinettis' second FDCPA claim, set forth in Count IV of their complaint, alleges that Ocwen failed to cease collection of a disputed debt, as required by 15 U.S.C. § 1692g(b).  Section 1692g(b) requires that a debt collector "shall cease collection of the debt" if, within thirty days of receiving a written notice from the debt collector, the consumer notifies the debt collector in writing that the debt is disputed.

---

section 1692a(6)(F)(iii)) does not become a debt collector under the FDCPA when it includes such a notice in some of its communications.  *See, e.g.*, *Alamo v. ABC Fin. Servs., Inc.*, No. 09-cv-5686, 2011 WL 221766, at *5–6 (E.D. Pa. Jan. 20, 2011); *Prince v. NCO Fin. Servs., Inc.*, 346 F. Supp. 2d 744, 751 (E.D. Pa. 2004); *Martin v. Select Portfolio Serving Holding Corp.*, No. 05-cv-273, 2008 WL 618788, at *5 (S.D. Ohio Mar. 3, 2008).  As the court in *Prince* noted, "an entity may generally be a 'debt collector' without being a 'debt collector' in a specific situation."  *Prince*, 346 F. Supp. 2d at 751.

As set forth in section 1692g(a), the notification provisions of section 1692 apply to only an "initial communication" made by a debt collector; that is, to trigger that provision, the Zinettis would have been required to notify Ocwen that they were disputing the account within 30 days of receiving an "initial communication" from Ocwen "in connection with the collection of" their mortgage debt. 15 U.S.C. § 1692g(a)–(b).  Ocwen contends that the initial communication sent to the Zinettis was either the notice of default sent to them on July 29, 2015, or the first pre-foreclosure referral letter sent to them on October 14, 2015.

The FDCPA has a one-year limitations period.  15 U.S.C. § 1692k(d); *Rotkiske v. Klemm*, 140 S. Ct. 355, 360 (2019); *Schaffhauser v. Citibank (S.D.) N.A.*, 340 F. App'x 128, 131 (3d Cir. 2009).  Accordingly, the Zinettis would have needed to bring this claim by no later than October 2016 in order to be within the limitations period.  This lawsuit, however, was not filed until 2019.[10] The Zinettis have not offered any evidence that an initial communication from Ocwen occurred

---

[10]  During the oral argument on the present motions, counsel for the Zinettis suggested that a borrower may require a debt collector to cease collection on a disputed debt at any time by notifying the debt collector of the dispute in writing, even though there is an explicit 30-day notification window specified in section 1692g(b).  In support of that proposition, the Zinettis cited four district court cases: *Jacques v. Solomon & Solomon P.C.*, 886 F. Supp. 2d 429, 432–34 (D. Del. 2012); *Santo v. U.S. Bank Nat'l Ass'n*, No. 17-cv-1597, 2018 WL 4680090, at *5–6 (M.D. Pa. Sept. 28, 2018); *Collins v. Phelan Hallinan Diamond & Jones, LLP*, No. 17-cv-3727, 2018 WL 1123743, at *3–4 (E.D. Pa. Mar. 1, 2018); and *Cowell v. Creditors Interchange Receivable Mgmt., LLC*, No. 08-cv-0962, 2009 WL 465580, at *2–3 (W.D. Pa. Feb. 25, 2009).  None of those cases directly addresses the question whether the borrower's written notification must occur within 30 days of a communication from a debt collector, as the statute provides.  While the *Collins* case states that section 1692g(b) "requires a debt collector, when the consumer disputes the debt, to provide the consumer with notice of how and when the debt was originally incurred," 2018 WL 1123743 at *3, that comment was not directed at the timing of the borrower's written notification, and there was no indication in that case that the borrower's written notification was outside the 30-day statutory period for a borrower's response to an initial communication from a debt collector. The Zinettis' cases therefore do not create a broader notification period that the period explicitly recited in section 1692g.

within the limitations period of the FDCPA.  This claim is therefore time-barred.  Summary judgment will be GRANTED to Ocwen on Count IV of the complaint.

### 4.  Count V

The Zinettis' third FDCPA claim, set forth in Count V of their complaint, alleges that Ocwen has failed to notify credit reporting bureaus that the debt on the Zinettis' mortgage account is in dispute, in violation of 15 U.S.C. § 1692e(8).  Section 1692e(8) prohibits a debt collector from communicating "to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed."  As the Eighth Circuit noted in *Wilhelm v. Credico, Inc.*, "if a debt collector elects to communicate 'credit information' about a consumer, it must not omit a piece of information that is always material, namely, that the consumer has disputed a particular debt."  519 F.3d 416, 418 (8th Cir. 2008).

The parties dispute whether Ocwen indicated to credit reporting bureaus that the Zinettis' mortgage account was disputed when Ocwen reported information about the Zinettis' account to those bureaus.  Ocwen contends that it designated the Zinettis' account as disputed in all communications with credit reporting agencies between September 2017 and May 2019, i.e., throughout the one-year limitations period preceding the filing of the Zinettis' complaint.  In support of its position, Ocwen submitted a declaration by an Ocwen employee, Kevin Flannigan, who stated that Ocwen marked the Zinettis' account as disputed throughout that period.  *See* Dkt. No. 90-2 at ¶ 42; Dkt. No. 91 at 16 & n.14.  The Zinettis, on the other hand, point to Angela Zinetti's declaration, in which she asserted that "Ocwen did not inform the credit bureaus that the account status was disputed."  Dkt. No. 87-3 at Apx67.

In light of that dispute, I asked the parties to provide additional documentary evidence to support their positions regarding this issue.  Dkt. No. 109.  The Zinettis provided copies of several

16

of their credit reports, some of which do not state on their face that the Zinettis' mortgage account was disputed. *See generally* Dkt. No. 110-1. For their part, the defendants submitted a spreadsheet listing the information that they provided to the credit reporting bureaus regarding the Zinettis' account. Dkt. No. 112-1. That spreadsheet indicates that, for the period of September 2017 through May 2019, Ocwen reported the Zinettis' account as disputed each month. *See id.* at 9–12.

Those submissions make clear that there is no genuine dispute of material fact regarding whether Ocwen reported that the Zinettis' mortgage account was disputed in its communications to credit reporting bureaus. Because liability under the FDCPA focuses on the conduct of the debt collector, the question whether the credit reporting bureaus reported that the Zinettis' account was disputed does not squarely address the issue before the court. Nevertheless, the Zinettis' credit reports illustrate that at least TransUnion was aware that the account was disputed.[11] *See, e.g.,* Dkt. No. 110-1 at 2 (listing the "AID" remark, meaning that the account was disputed, for the Zinettis' account beginning in September 2017), 4 (listing the "AID" remark for the months of January through April 2009). For the Zinettis' TransUnion reports, the only relevant months for which an "AID" remark does not appear are months for which no data at all (e.g., balance, amount paid, etc.) is reported for the Zinettis' account. *See generally* Dkt. No. 110-1. The reports' failure to list a dispute in those months therefore sheds no light on the question whether Ocwen reported the account as disputed to TransUnion for those months.

---

[11] With respect to the Zinettis' Equifax reports, the reports do not indicate on their face that the Zinettis' mortgage account was disputed. *See* Dkt. No. 110-1 at 8–12. However, it is not at all clear that an account's dispute status would have been included on a report in the form shown in Dkt. No. 110-1, and if so, where on the report that information would have been listed. The Zinettis' Equifax reports are therefore not sufficient to create a triable issue regarding whether Ocwen disclosed to Equifax that the Zinettis' account was disputed.

As for the other evidence, Ms. Zinetti's declaration is entitled to no additional weight, as her statement that Ocwen did not report that their account was disputed was based entirely on the fact that in several reports, one of the credit reporting agencies did not note that the account was disputed; her declaration did not indicate that she had any other reason to believe that Ocwen had not reported the account as disputed in its communications with the credit reporting agency.  Mr. Flannigan, on the other hand, had access to that information and stated unequivocally that Ocwen had "marked the Zinettis [sic] account as disputed with a 'XB' code when reporting to the credit reporting agencies."  Dkt. No. 90-2, at ¶ 42.  The evidence shows that the "XB" code was Ocwen's indication that the account was disputed.[12]  Accordingly, there is insufficient evidence in the record to create a triable issue regarding whether Ocwen failed to report the Zinettis' account status as disputed.  Summary judgment is therefore GRANTED to Ocwen on Count V of the complaint.

C.  Real Estate Settlement Procedures Act

The Zinettis' RESPA claim, set forth in Count II of their complaint, alleges that Ocwen failed to conduct a reasonable investigation after the Zinettis sent Ocwen several notices of error in 2014.[13]  One of the implementing regulations of RESPA, which is known as "Regulation X," requires that when a borrower submits a "notice of error," the loan servicer must either: (1) correct

---

[12]  Moreover, use of the "XB" code to mark accounts as disputed appears to be common practice among lenders.  *See, e.g.*, *Ingram v. Experian Info. Sols., Inc.*, No. 18-cv-3776, 2021 WL 2681275, at *3 (E.D. Pa. June 30, 2021); *Davis v. Nationwide Collection Agencies, Inc.*, No. 17-cv-13618, 2018 WL 3020440, at *1 (E.D. Mich. June 18, 2018); *Horton v. Trans Union, LLC*, No. 12-cv-2072, 2015 WL 1055776, at *3 (E.D. Pa. Mar. 10, 2015).

[13]  In their motion for summary judgment, the Zinettis suggest that they are entitled to relief under 15 U.S.C. § 2605(k)(1), which was not a ground for relief asserted in their complaint.  *See* Dkt. No. 87-1 at 8–11; *see generally* Dkt. No. 1-1.  Because a RESPA claim under section 2605(k)(1) was not included in the Zinettis' complaint, it is not before the court for consideration on the Zinettis' motion for summary judgment, and I decline to address it.  *See Shahin v. Del. Fed. Credit Union*, No. 10-475, 2013 WL 5304104, at *5 (D. Del. Sept. 19, 2013) ("A plaintiff cannot raise a claim for the first time at the summary judgment stage if it was not included in the complaint.").

the error(s) identified by the borrower and provide the borrower with a notification of the correction; or (2) conduct a "reasonable investigation" and provide the borrower with a notification that includes, among other items, a statement of the reasons for the servicer's determination that no error occurred.  12 C.F.R. § 1024.35(e)(1)(i).  When a borrower submits a notice of error that is duplicative, the loan servicer is not required to correct the error or conduct a reasonable investigation so long as it notifies the borrower that the notice of error is duplicative of another notice to which the loan servicer has responded to under section 1024.35(e).  *Id.* § 1024.35(g).

At issue in this case are four notices of error that the Zinettis sent to Ocwen in 2018.[14]  The Zinettis' four notices of error were sent on April 4, 2018; June 11, 2018; August 27, 2018; and November 30, 2018.  Dkt. No. 87-3 at Apx369–71, Apx382–95.  Ocwen responded to each of those notices of error.  *See* Dkt. No. 90-2 at ¶¶ 38–41; *see generally* Dkt. No. 90-16 (providing copies of each notice of error and Ocwen's response to each notice).  The Zinettis allege that the investigations that Ocwen undertook in responding to those notices were unreasonable, but their arguments essentially amount to the contention that Ocwen failed to properly administer their escrow account.  As noted above with respect to the Zinettis' breach of contract claim, the Zinettis have not pointed to any error in Ocwen's escrow calculations that would entitle them to relief in this case.[15]  Accordingly, their RESPA claim fails for the same reason.  Summary judgment will therefore be GRANTED to Ocwen on that claim.

---

[14]  The Zinettis make reference to three other notices of error, all from prior to 2018, but Ocwen contends that those notices were outside the limitations period applicable to RESPA claims, 12 U.S.C. § 2614.  During the oral argument on the present motions, counsel for the Zinettis agreed that claims regarding the Zinettis' pre-2018 notices of error are barred by the RESPA statute of limitations.

[15]  Ocwen responded to the November 30, 2018, notice of error in part by explaining that the notice was duplicative of a prior notice sent by the Zinettis.  Such a response was proper under 12 C.F.R. § 1024.35(g), and the Zinettis have offered no evidence that Ocwen's response to that

IV.    <u>**Conclusion**</u>

In summary, the Zinettis have not raised a triable issue with respect to any of the remaining claims in this case.  The defendants' motion for summary judgment is therefore GRANTED.  The defendants' *Daubert* motion challenging the expert testimony of the Zinettis' expert, Bernard Jay Patterson, and the Zinettis' motion for summary judgment are DENIED as moot.  A corresponding judgment will be filed subsequent to this order.

IT IS SO ORDERED.

SIGNED this 3rd day of August, 2022.

_____
WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

---

notice was improper for any reason other than that Ocwen allegedly did not conduct a reasonable investigation regarding the prior notices.

# APPENDIX

| Month | Target Payment | Amount Paid by Zinettis | Amount Over/Underpaid | Notes | | | |
|---|---|---|---|---|---|---|---|
| February-10 | $1,142.77 | $1,525.35 | $382.58 | | | | |
| March-10 | $1,142.77 | $1,525.35 | $382.58 | | | | |
| April-10 | $1,142.77 | $1,142.77 | $0.00 | | | | |
| May-10 | $1,142.77 | $1,142.77 | $0.00 | | | | |
| June-10 | $1,142.77 | $1,142.77 | $0.00 | | | | |
| July-10 | $1,142.77 | $1,142.77 | $0.00 | | | | |
| August-10 | $1,142.77 | $1,142.77 | $0.00 | | | | |
| September-10 | $1,142.77 | $1,142.77 | $0.00 | | | | |
| October-10 | $1,142.77 | $1,142.77 | $0.00 | | | | |
| November-10 | $1,142.77 | $1,142.77 | $0.00 | | | | |
| December-10 | $1,142.77 | $1,142.77 | $0.00 | | | | |
| January-11 | $1,142.77 | $1,142.77 | $0.00 | | | | |
| February-11 | $935.22 | $935.22 | $0.00 | | | | |
| March-11 | $935.22 | $935.22 | $0.00 | | | | |
| April-11 | $935.22 | $935.22 | $0.00 | | | | |
| May-11 | $935.22 | $935.22 | $0.00 | | | | |
| June-11 | $935.22 | $935.22 | $0.00 | | | | |
| July-11 | $935.22 | $0.00 | ($935.22) | Payment returned to Zinettis but never resubmitted | | | |
| August-11 | $935.22 | $0.00 | ($935.22) | Payment returned to Zinettis but never resubmitted | | | |
| September-11 | $935.22 | $935.22 | $0.00 | | | | |
| October-11 | $935.22 | $935.22 | $0.00 | | | | |
| November-11 | $995.22 | $935.22 | ($60.00) | | | | |
| December-11 | $995.22 | $935.22 | ($60.00) | | | | |
| January-12 | $995.22 | $935.22 | ($60.00) | | | | |
| February-12 | $995.22 | $935.22 | ($60.00) | | | | |
| March-12 | $995.22 | $935.22 | ($60.00) | | | | |
| April-12 | $995.22 | $935.22 | ($60.00) | | | | |
| May-12 | $995.22 | $935.22 | ($60.00) | | | | |
| June-12 | $995.22 | $935.22 | ($60.00) | | | | |
| July-12 | $995.22 | $935.22 | ($60.00) | | | | |
| August-12 | $995.22 | $935.22 | ($60.00) | | | | |
| September-12 | $995.22 | $935.22 | ($60.00) | Payment applied to suspense balance | | | |
| October-12 | $1,010.90 | $935.22 | ($75.68) | Payment applied to suspense balance | | | |
| November-12 | $1,010.90 | $935.22 | ($75.68) | | | | |
| December-12 | $1,010.90 | $935.22 | ($75.68) | | | | |
| January-13 | $1,010.90 | $935.22 | ($75.68) | | | | |
| February-13 | $1,010.90 | $935.22 | ($75.68) | | | | |
| March-13 | $1,006.90 | $935.22 | ($71.68) | | | | |
| April-13 | $1,006.90 | $935.22 | ($71.68) | | | | |
| May-13 | $1,006.90 | $935.22 | ($71.68) | | | | |
| June-13 | $1,006.90 | $935.22 | ($71.68) | | | | |
| July-13 | $1,006.90 | $935.22 | ($71.68) | | | | |
| August-13 | $1,006.90 | $935.22 | ($71.68) | | | | |
| September-13 | $1,006.90 | $935.22 | ($71.68) | | | | |
| October-13 | $1,006.90 | $935.22 | ($71.68) | | | | |
| November-13 | $1,006.90 | $935.22 | ($71.68) | | | | |
| December-13 | $1,006.90 | $935.22 | ($71.68) | | | | |
| January-14 | $1,006.90 | $935.22 | ($71.68) | | | | |
| February-14 | $1,006.90 | $935.22 | ($71.68) | Payment applied to suspense balance | | | |
| March-14 | $1,006.90 | $935.22 | ($71.68) | | | | |
| April-14 | $1,006.90 | $935.22 | ($71.68) | | | | |
| May-14 | $1,006.90 | $1,000.00 | ($6.90) | | | | |
| June-14 | $1,006.90 | $1,000.00 | ($6.90) | | | | |
| July-14 | $1,006.90 | $1,000.00 | ($6.90) | | | | |
| August-14 | $1,006.90 | $1,000.00 | ($6.90) | | | | |
| September-14 | $1,006.90 | $1,000.00 | ($6.90) | | | | |
| October-14 | $1,006.90 | $1,000.00 | ($6.90) | | | | |
| November-14 | $1,138.45 | $1,000.00 | ($138.45) | | | | |
| December-14 | $1,138.45 | $1,000.00 | ($138.45) | | | | |
| January-15 | $1,264.76 | $1,100.00 | ($164.76) | | | | |
| February-15 | $1,264.76 | $1,100.00 | ($164.76) | | | | |
| March-15 | $1,264.76 | $1,100.00 | ($164.76) | | | | |
| April-15 | $1,264.76 | $1,100.00 | ($164.76) | | | | |
| May-15 | $1,264.76 | $1,100.00 | ($164.76) | | | | |
| June-15 | $1,264.76 | $1,100.00 | ($164.76) | | | | |
| July-15 | $1,264.76 | $1,100.00 | ($164.76) | Payment applied to suspense balance | | | |
| | | **Total Amount Over/Underpaid** | ($4,618.82) | | | | |